No. 48,071

LEON STOPPEL, F. C. BRUNGARDT and TWILA BRUNGARDT, *Appellees*,
v. C. R. MASTIN, *Appellant.*

(556 P. 2d 894)

Opinion
filed November 6, 1976.

*Douglas C. Spencer*, of Oakley, argued the cause, and *Corwin C. Spencer* and *James A. Spencer*, also of Oakley, were with him on the brief for the appellant.

*J. Stephen Nyswonger*, of Garden City, argued the cause, and *Lelyn J. Braun*, of Garden City, was with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: The question presented by this appeal concerns the rights of a landlord and his new tenant to the idle ground,

where the lease of a holdover tenant on a year-to-year basis is terminated by proper notice. The land in question was being farmed by the holdover tenant on a summer fallowing basis whereby one-half of the ground is seeded to wheat every other year.

C. R. Mastin (defendant-appellant) was operating land owned by Frank C. Brungardt and Twila Brungardt (plaintiffs-appellees) as the holdover tenant in possession of 480 acres of land. The original written lease under which Mastin took possession was dated February 24, 1956. It was for a term of twelve months, beginning August 1, 1956, and ending on August 1, 1957. The lease gave the legal description of the 480 acres in Logan County and, in so far as material to this appeal, Mastin agreed:

". . . First. To cultivate in a good, careful and workmanlike manner all the tillable land on said premises. Second. To allow no waste, to carefully protect all trees, buildings, fences and improvements of every kind on said premises during the continuance of this lease, and at the expiration of the term herein granted to yield up possession of said premises unto the party of the first part in as good condition as when taken, ordinary wear and loss by the elements excepted. Third. To not remove or allow any other person to remove any improvements of any kind from said premises, and to protect same from fire by plowing and burning when necessary, and to keep said premises and every part thereof in good condition and repair without expense to the party of the first part. Fourth. To pay to party of the first part, their heirs and assigns, for the use and occupation of said premises, rent as follows:

"⅓ of all crops raised
of all crops and grasses raised on said farm during the term of this lease; and to pay cash rent of $ none * * *.

"Fifth. To thresh out or combine and deliver the lessor's share of the small grain before as soon as harvested, * * *, and to husk out the rent corn and deliver same before as soon as harvested * * *. Also, give said first party or his agent 5 days' advance notice of the date he is to thresh or combine the small grain raised, and when threshed, combined or husked to deliver without waste first party's share of all crops free of all expense, at nearest elevator.

"Sixth. *Party of the first part, his agent or tenant shall have the right to enter upon said premises as soon as second party has harvested the grain grown thereon for the purpose of preparing the land and seeding for crop of 1958, and shall thereafter have full possession of the land so taken.*" (Emphasis added.)

The parties stipulated that pursuant to the term of the above lease the original term of the lease expired August 1, 1957, and as the holdover tenant under the terms of that lease the holdover tenancy terminated August 1, 1972. (See, K. S. A. 58-2506, amended L. 1975, ch. 294, § 1.)

On December 9, 1971, Frank C. Brungardt and Twila Brungardt

entered into a lease of the above described land with Leon K. Stoppel (plaintiff-appellee) wherein Stoppel was given a three year farm tenancy lease of the premises beginning on March 1, 1972, and ending on March 1, 1975, subject to the rights of the present tenant thereon to remove his growing crops therefrom.

Prior to August 1, 1972, Mastin voluntarily relinquished possession of a part of the land to the Brungardts, and although that land was covered in the lease there is no issue in this case with respect to that land. The parties stipulated that exclusive of that portion of the land under lease from which a crop had been harvested in 1972, concerning which there is no controversy between them, there were 294.7 acres which could have been sowed to wheat in the fall of 1972 (referred to as idle ground under the summer fallowing practice), and Leon K. Stoppel did in fact sow 294.5 acres of this ground to wheat.

The trial court, after hearing all of the evidence and giving consideration to stipulations of the parties, found that the written lease under which Mastin was operating as a holdover tenant was terminated August 1, 1972, by the Brungardts by a notice to terminate tenancy dated March 11, 1972, from the Brungardts' attorney. The trial court also found that Mastin prior to that time was informed by the Brungardts and Stoppel that Stoppel was the new tenant of this land by reason of the written lease heretofore described. The information and new lease were also effective as notice of termination of Mastin's lease under its terms on August 1, 1972. The trial court further found:

### "No. 3

"Because of such termination date of August 1, 1972, the defendant Mastin had no obligation under Plaintiffs' exhibit # 1, a share crop lease, to plow or prepare any of the ground left idle since the harvest in 1971, for planting of the wheat crop to be harvested in 1973; and defendant did no such work.

### "No. 4

"Paragraph 'sixth' of Plaintiffs' exhibit # 1, so far as the new tenant Leon Stoppel is concerned, is a contract or provision thereof between the contracting parties for the benefit of a 3rd party, the new tenant, and as such is enforceable by such 3rd party in his own name as well as in the name of the contracting parties. Privity of contract is not necessary by such 3rd party beneficiary of the contract, Plaintiffs' exhibit # 1.

### "No. 5

"Plaintiffs' exhibits # 1 and # 2 do not conflict with each other by their terms. Both are share crop leases, and Plaintiffs' exhibit # 2 had none, and

could have no effect on the growing wheat harvested in 1972 by the Defendant Mastin.

## "No. 5A

"The evidence shows that the leased premises was farm land for growing wheat with the practice each year of planting approximately half of the acreage with the other half idle and in a fallow program.

"Under this common practice each approximate half of the land would be idle in a fallow program and planted to wheat in alternate years.

"Thus, the acreage in controversy herein was the 294.7 acres from which wheat was harvested in the summer of 1971, which would not be ready for planting again until the fall of 1972 for the 1973 harvest.

"This 294.7 acres became subject to the terms of Paragraph Sixth of Plaintiffs' exhibit # 1 following the harvest thereon in the summer of 1971.

## "No. 6

"At the time the defendant Mastin learned of Plaintiffs' exhibit # 2, and that the plaintiff Leon Stoppel was the new tenant, which was sometime prior to March 11, 1972, the defendant Mastin became obligated under Paragraph 'sixth' of Plaintiffs' exhibit # 1 to deliver possession to the new tenant Leon Stoppel of all crop ground left idle since the last harvest thereon, which was in the summer of 1971, except such which he intended to plant to a crop which could be harvested prior to August 1, 1972.

"The Court finds that at no time did defendant have any desire or intention to plant, and did not plant, any such idle ground consisting of the 294.7 acres referred to in Paragraph Five of the Stipulation. Nor had the defendant conducted any work on such 294.7 acres since harvest thereon in the summer of 1971.

## "No. 7

"Under ordinary farm practice such idle 294.7 acres should have been worked two or three times between mid-April 1972 and before planting in the fall of 1972 for the wheat crop to be harvested in 1973. *The tenant, the plaintiff Stoppel, in early April, 1972, requested of defendant possession for this 294.7 acres for this purpose and defendant refused any possession before August 1, 1972, unless Mr. Stoppel would employ defendant to work the idle ground under conditions proposed by defendant, or pay the defendant $750.00 with no employment of the defendant.* Both conditions of employment or the sum of $750.00 with no employment were illegal requirements for possession of the idle ground under the terms of Plaintiffs' exhibit # 1, Paragraph 'sixth' thereof.

"The plaintiff Stoppel refused to comply with such conditions for possession and was prevented by defendant Mastin from possession and cultivating the idle ground until August 1, 1972. *Except that the plaintiff Stoppel did go over about 80 acres of such idle ground in the SE ¼ of section 22 about May 10, 1972, but was ordered to discontinue by defendant Mastin when discovered, and did so.*

## "No. 8

"Thus also the plaintiffs were effectively prevented by defendant Mastin from doing anything to minimize damages resulting from inability to work

the 294.7 acres by cultivating the same prior to August 1, 1972. The plaintiff Stoppel did work the ground once after August 1, 1972 before planting the entire 294.7 acres to wheat in the fall of 1972 for harvest in 1973.

"No. 9

"The Court finds the plaintiffs suffered damages because of breach by defendant Mastin of Paragraph 'sixth' of Plantiffs' exhibit # 1, in refusing and preventing possession of the idle 294.7 acres prior to August 1, 1972, and resulting in decreased yield thereby in the 1973 harvest as follows:

"To F. C. and Twila Brungardt, $2,500.00.

"To Leon Stoppel, $5,000.00." (Emphasis added.)

Two actions were filed against Mastin, one by the Brungardts and the other by Stoppel. The trial court consolidated these actions for trial and in accordance with the foregoing findings entered judgment against Mastin of $5,000 in favor of Stoppel and $2,500 in favor of the Brungardts, plus costs and interest of 8% per annum from March 26, 1975.

The findings of fact made by the trial court are not challenged; therefore, we must assume they are supported by sufficient evidence presented at the trial. Except for the written documents, the authenticity of which is not challenged, none of the evidence is set forth in the record. The parties agree Mastin was a holdover tenant under the terms of his original lease. (K. S. A. 58-2506 [now K. S. A. 1975 Supp. 58-2506]; and *Woodmancy v. Brady*, 176 Kan. 522, 271 P. 2d 288.)

Mastin has duly perfected an appeal from the foregoing judgment. He contends the trial court erred in finding that Stoppel was a real party in interest as against him, and that the trial court erred in awarding Stoppel damages in the sum of $5,000.

Liability for the expense of preparing ground for crops which cannot be harvested during the term of the lease is a matter generally agreed upon by the parties. It has been held that a tenant is not entitled to recover money expended by him in preparing the land for planting a crop he could not hope to harvest, because it would not mature until after his lease expired. (*Kohn v. Babb*, 204 Kan. 245, 461 P. 2d 775; and *Woodmancy v. Brady*, supra.)

Generally, a tenant renting on a crop-share basis is not entitled to a crop sown but not maturing before the expiration of his lease. (*Kohn v. Babb*, supra at 250.)

On the facts in this case Mastin's lease expired August 1, 1972. The notice of termination to Mastin is not challenged. Under the summer fallowing practice conducted by Mastin in growing wheat,

the 294.7 acres of idle land could not have been seeded to wheat and harvested before the harvest season of 1973, long after the termination of his lease. (See, *Fox v. Flick*, 166 Kan. 533, 203 P. 2d 186; and *Woodmancy v. Brady*, supra.) Therefore, under the specific provisions of the sixth paragraph of Mastin's lease, the landlord, "his agent or tenant" had the right to enter upon the 294.7 acres of idle land as soon as Mastin harvested the 1971 wheat, and received notice of termination of his holdover tenancy, for the purpose of preparing the land and seeding it to wheat for the succeeding crop.

Stoppel as the new tenant of the Brungardts on March 1, 1972, by reason of his written three year crop-share lease, had the right to enter upon the premises for the purpose of preparing the land and seeding it to wheat for the crop to be harvested in 1973. (See Finding No. 6; and *Duckworth v. Michel*, 172 Wash. 234, 19 P. 2d 914 [1933].) As such, Stoppel was a real party in interest.

Mastin contends he was required by the terms of his lease to continue farming the land without compensation until August 1, 1972, and his failure to work the 294.7 acres of idle ground prior to August 1, 1972, was a breach of his lease for which Brungardts were entitled to damages. From this premise Mastin argues Stoppel was not a real party in interest. For the reasons stated we think this argument has no merit. The lease Mastin had with the Brungardts specifically gave the Brungardts' new tenant the right to enter upon the land after the 1971 wheat crop was harvested when Mastin was legally notified of the termination of his lease with the Brungardts.

The failure of Mastin to permit Stoppel to enter upon the premises and work the ground for the seeding of wheat in the fall of 1972 resulted in a substantial decrease in the production of the wheat seeded in the fall of 1972 and harvested in 1973. This reduction in wheat yield was the basis upon which the trial court determined the damages. (See, *Gowing v. McCandless*, 219 Kan. 140, 547 P. 2d 338; and 21 Am. Jur. 2d, Crops, § 79, p. 665.) The total damages assessed against Mastin were awarded by the trial court in accordance with the terms of Stoppel's crop-share lease, one-third to the Brungardts and two-thirds to Stoppel. (See, *Edwards v. Solar Oil Corp.*, 177 Kan. 219, 277 P. 2d 614.)

K. S. A. 1975 Supp. 60-217 (*a*) provides that every action shall be prosecuted in the name of the real party in interest. In *Torkelson v. Bank of Horton*, 208 Kan. 267, 491 P. 2d 954, this court stated:

"The phrase 'real party in interest' as used in our code as well as in the equity procedure from whence it sprang generally came into being in determining which of two or more persons might properly bring an action where holders of assignment or subrogation rights, either whole or partial, *holders of different interests in the same property,* holders of equitable interests, representatives, trustees and the like were concerned. . . . The requirement that an action be brought by the real party in interest has as one of its principal purposes the protection of the defendant from being repeatedly harassed by a multiplicity of suits for the same cause of action so that if a judgment be obtained it is a full, final and conclusive adjudication of the rights in controversy that may be pleaded in bar to any further suit instituted by any other party . . . One standard frequently applied is that the real party in interest is the one entitled to the fruits of the action, and the phrase 'real party in interest' is grammatically quite capable of that meaning . . . In 3A Moore's Federal Practice . . . the author has this to say:

" 'The meaning and object of the real party in interest provision would be more accurately expressed if it read: *An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced.'* (p. 53.)

"A party's substantive right to recover in a particular action is neither enlarged nor restricted by the provisions of the real party in interest rule and we look then to substantive law to see what if any claim for relief plaintiff here has stated in his petition. . . ." (pp. 269, 270.) (Emphasis added.)

Joinder of the landlords and tenant (Stoppel) as plaintiffs in their separate actions against Mastin, the holdover tenant, was proper. (*Edwards v. Solar Oil Corp.,* supra; and 52A C. J. S., Landlord & Tenant, § 822, p. 373.)

The appellant next contends the trial court erred in finding the appellees were unable to mitigate their damages and in awarding the Brungardts damages in the amount of $2,500.

On the record here presented it was through Mastin's own acts that the rights of the Brungardts and Stoppel were frustrated. Mastin attempted to bring undue pressure upon the appellees to force them to answer his dictates for return of the idle land contrary to the provisions of the lease he had with the Brungardts.

Stoppel did enter upon the idle ground about May 10, 1972, and had worked 80 acres before Mastin ordered him off the land. Under these circumstances the appellees did, in fact, attempt every effort to mitigate any losses that may have been occasioned by the willful and wanton acts of Mastin. The conditions Mastin imposed were properly labeled by the trial court as illegal requirements for the possession of the idle ground under the terms of the lease between Mastin and the Brungardts and in particular

the sixth paragraph thereof. The damages occasioned by reason of Mastin's failure to comply with the terms of the sixth paragraph in his lease were of his own creation, and these damages cannot be attributed to the appellees. The Brungardts and Stoppel in no way created the situation causing damages in this case.

The judgment of the lower court is affirmed.