No. 49,635

James D. Henderson, *Appellant,* v. Richard M. Hassur, *Appellee.*

(594 P.2d 650)

Opinion filed May 5, 1979.

*James L. Grimes, Jr.,* of Cosgrove, Webb & Oman, of Topeka, argued the cause and was on the brief for the appellant.

*Charles S. Fisher, Jr.,* of Fisher, Ralston, Ochs & Heck, P.A., of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: This case grew out of the expansion of the Pizza Hut restaurant business into old Mexico. This is the second appearance of the case in the appellate courts of Kansas. The first appeal was dismissed because it was taken from an interlocutory order, not appealable as of right and without proper certification. See *Henderson v. Hassur,* 1 Kan. App. 2d 103, 562 P.2d 108 (1977). At that stage of the proceedings the defendant-appellee Hassur had been granted a partial summary judgment on his counterclaim disposing of the issues of liability and actual damages. On remand to the trial court all remaining issues were disposed of, including the issue of punitive damages. The case now returns to this court for a review of all orders, decisions and judgments of the trial court. This appeal involves a judgment in favor of defendant Hassur on a counterclaim for actual damages in the amount of $48,000.00 plus interest and for exemplary damages in the amount of $215,000.00. A factual background is necessary to understand the points raised.

The plaintiff James Henderson had been engaged in the real estate development business for twenty years. He spoke Spanish and had worked in Mexico at various times. He learned that the defendant Richard Hassur was interested in locating Pizza Hut restaurants in Mexico so he talked with Hassur and offered his services to locate sites for the restaurants.

The defendant Hassur is a developer and operator of Pizza Hut restaurants throughout North America. Hassur informed Hen-

derson he had already purchased the franchises for Mexico. Henderson offered to locate both sites and landlords for Pizza Hut restaurants in Mexico. Henderson had a partner by the name of Kenneth Perry who assisted Henderson. Hassur accepted Henderson's offer and the following agreement was prepared by Henderson and executed by Hassur in longhand:

> "It is agreed that Henderson & Perry will seek out Pizza Hut locations in Mexico City, (Satelight City), Acapulco, Montarey, and other towns agreed upon. On the first site acquired for me in each town as a result of Henderson-Perry efforts I will pay them $4,000 per site plus 1% of the gross revenue derived from the location for the lease term. Payment due on closing of acquisition and start of construction of Pizza Hut. Option expenses, approved by me, shall be borne by me. Travel & subsistence expenses of Henderson & Perry to be borne by them.
>
> s/ Richard Hassur
> Apr. 4, 1969"

Henderson and Perry agreed orally between themselves that they would go to Mexico at their own expense and split commissions and expenses fifty-fifty. While Henderson was in Mexico looking for Pizza Hut locations he met a building contractor by the name of Jose Vorhauer. Vorhauer had many years of experience dealing with American firms and spoke English. It was discovered that Hassur needed to own at least one location in Mexico in order to operate a string of Pizza Hut restaurants on leased locations. Henderson and Vorhauer collaborated in securing a site for this purpose and in having Hassur purchase the same. It is referred to herein as the Satellite City site. The actual cost was $56,000.00 and it was turned over to Hassur for $88,000.00. The markup of $32,000.00 which was realized on the sale was paid one-half to Henderson and the other half went into a joint venture account of Vorhauer and Henderson for the construction of Pizza Hut restaurants to be operated by Hassur. The profit margin of $32,000.00 was not disclosed to Hassur.

In addition to the $32,000.00 markup Henderson was credited with finding this and three other sites in Mexico. Under the handwritten agreement Henderson and Perry were paid a total of $16,000.00 by Hassur for their efforts in locating and securing such sites. In addition to the $4,000.00 per site, Henderson was supposed to receive one percent (1%) of the gross revenue derived from each location during the original lease term. This percentage of gross revenue was not paid.

Henderson filed suit against Hassur seeking an accounting and

recovery of all sums due from one percent of revenue. Hassur filed answer and a counterclaim in which he claimed damages, both actual and punitive, for alleged fraud and breach of fiduciary relationship. On the basis of admissions in the deposition testimony of Henderson the trial court entered a partial summary judgment in favor of Hassur on his counterclaim. After the first appeal was dismissed the case was remanded for trial and the jury returned a verdict for punitive damages. The appeal of the entire case is now before us.

Appellant Henderson's first point of error is based on the claim that Hassur is not the real party in interest in this action. K.S.A. 60-217(a) requires that "[e]very action shall be prosecuted in the name of the real party in interest." This requirement is considered in some depth by the court in *Torkelson v. Bank of Horton,* 208 Kan. 267, 491 P.2d 954 (1971), wherein the following comments are made:

"The requirement that an action be brought by the real party in interest has as one of its principal purposes the protection of the defendant from being repeatedly harassed by a multiplicity of suits for the same cause of action so that if a judgment be obtained it is a full, final and conclusive adjudication of the rights in controversy that may be pleaded in bar to any further suit instituted by any other party (*First National Bank of Topeka v. United Telephone Ass'n,* 187 Kan. 29, 353 P.2d 963). One standard frequently applied is that the real party in interest is the one entitled to the fruits of the action, and the phrase 'real party in interest' is grammatically quite capable of that meaning (James, Civil Procedure, § 9.2). In 3A Moore's Federal Practice (2d ed. 1970) § 17.02, the author has this to say:

" 'The meaning and object of the real party in interest provision would be more accurately expressed if it read: *An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced.*' (p. 53.)" 208 Kan. at 270.

See also *Stoppel v. Mastin,* 220 Kan. 667, 672-673, 556 P.2d 394 (1976); *Hall v. Pioneer Crop Care, Inc.,* 212 Kan. 554, 559, 512 P.2d 491 (1973); *Winsor v. Powell,* 209 Kan. 292, Syl. ¶ 3, 497 P.2d 292 (1972); *Lawrence v. Boyd,* 207 Kan. 776, 778, 486 P.2d 1394 (1971).

Appellant notes that none of the property and interests in Mexico were owned by Hassur individually. It was owned and held by a Mexican corporation named Central Development Inc. (CDI). Hassur was the sole and only stockholder. The check for the Satellite property came from CDI, although the money originally came from Hassur in the form of a loan to CDI. All loans were paid when Hassur finally sold CDI. Appellant argues if

anyone was injured by his actions it was CDI, not Hassur. An examination of the pleading filed by Hassur indicates his cause of action is not predicated on damage caused by overpayment, but rather on the legal principle requiring an agent to account to his principal for any secret profit the agent obtains in transacting his principal's business.

The counterclaim also seeks the return of all compensation paid to Henderson under the legal theory that an unfaithful agent loses his right or claim to compensation when he violates his duty to the principal.

If Henderson was an agent, he was an agent by virtue of the handwritten agreement. CDI was not a party to that agreement. If Henderson did breach a fiduciary duty, it was a duty owing to Hassur and Hassur was the party entitled to the fruits of the relationship. Hassur is the party who has the rights now sought to be enforced. An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced and Hassur is the real party in interest as to the counterclaim.

Appellant's second point of error is that, contrary to the trial court's findings, appellant Henderson was an independent contractor and was not an agent of Hassur; therefore he owed him no fiduciary duty. The determination of what constitutes agency and whether there is any competent evidence reasonably tending to prove its existence is a question of law. See *Brown v. Wichita State University,* 217 Kan. 279, Syl. ¶ 3, 540 P.2d 66 (1975), vacated in part 219 Kan. 2, 547 P.2d 1015, *cert. dismissed* 429 U.S. 806 (1976); *First National Bank of Denver v. Caro,* 211 Kan. 678, Syl. ¶ 3, 508 P.2d 516 (1973); *Hendrix v. Phillips Petroleum Co.,* 203 Kan. 140, Syl. ¶ 8, 453 P.2d 486 (1969). However, the weight to be given evidence and the resolution of conflicts therein are functions of the trier of fact. See *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, 371, 548 P.2d 719 (1976); *Thurman v. Cundiff,* 2 Kan. App. 2d 406, 412, 580 P.2d 893 (1978). Did a genuine issue remain as to whether Henderson was Hassur's agent? The trial court examined the handwritten contract, the deposition testimony of Henderson, and concluded the relationship of principal and agent or more particularly that of principal and broker had been created. In reaching this conclusion the court applied the following definition of broker taken from 12 Am. Jur. 2d, Brokers § 1, pp. 772-773:

"As generally defined, a broker is an agent who, for a commission or brokerage fee, bargains or carries on negotiations in behalf of his principal as an intermediary between the latter and third persons in transacting business relative to the acquisition of contractual rights, or to the sale or purchase of any form of property, real or personal, the custody of which is not entrusted to him for the purpose of discharging his agency. Brokers have also been defined as those who are engaged for others in the negotiation of contracts relative to property, with the custody of which they have no concern. They act as negotiators in bringing other persons together to bargain; generally, they ought not to sell or contract in their own name, have no implied authority to receive payment, are not entrusted with possession of the goods bought or sold, and have no special property or lien thereon. Brokers are of many kinds, according to the particular classes of transactions in which they engage."

This definition is cited approvingly by this court in *Brakensiek v. Shaffer*, 203 Kan. 817, 820, 457 P.2d 511 (1969). There would seem to be no question that Henderson and Perry were brokers for Hassur under the contract. This court specifically holds in *Brakensiek* that the fact a person does not have a brokerage license does not prevent him from being a broker.

The principal-broker relationship is that of agency, as this court holds in *Hiniger v. Judy*, 194 Kan. 155, 158, 398 P.2d 305 (1965):

"The primary relation, as between customer and real estate broker, is that of agency, and the general rules of law applicable to principal and agent govern their rights and liabilities. Furthermore, agency can result only from contract, express or implied, and in determining whether a valid contract has been entered into, the rules which pertain to contracts generally are applicable. There must be consideration, mutuality and a meeting of the minds as to essential matters. Meeting of the minds may be shown by implication, by conduct of the parties. Like other features essential to a cause of action, the burden of establishing agency is upon the party asserting it. (*Patee v. Moody*, 166 Kan. 198, 199 P.2d 798.)"

See also *Lord v. Jackman*, 206 Kan. 22, Syl. ¶ 2, 476 P.2d 596 (1970); *George v. Bolen-Williams, Realtors*, 2 Kan. App. 2d 385, 388, 580 P.2d 1357 (1978).

As generally defined, a broker is an agent who for a commission or brokerage fee, carries on negotiations in behalf of his principal as an intermediary between the latter and third persons in transacting business relative to the sale or purchase of contractual rights or any form of property. In this case there can be no question but that a valid express agency contract was entered into. There is also no question the contract remained in effect during all the events relevant to this appeal. The relation of

principal and agent can only be terminated by the act or agreement of the parties to the agency or by operation of law and an agency shown to have existed is presumed to have continued in the absence of anything to show its termination, unless such a length of time has elapsed as to destroy the presumption. See *Merchant v. Foreman,* 182 Kan. 550, 555, 322 P.2d 740 (1958). See also *George v. Bolen-Williams, Realtors,* 2 Kan. App. 2d at 391.

We come now to the question of whether the trial court could hold as a matter of law that Henderson's conduct violated a fiduciary duty owed to his principal, Hassur. In his deposition Henderson testified fully about the acquisition of the Satellite City property and about the markup received by Vorhauer and himself from the purchase and sale of the property. He testified:

"A. Well, when Mr. Vorhauer and I could not proceed on the consummation of the earlier option in Satellite, during this period Mr. Vorhauer and I became very well you might say helpful to each other, he provided me transportation and office space and contacts with other groups of people that were interested in development in Mexico. . . . So Mr. Vorhauer and I decided that it might be good if we would enter into a real estate development business developing food franchise operations throughout Mexico. And it was during this period of time that he had his representatives scouring the countryside you might say for sites. Now, he had one advantage in that the people he hired were quite inexpensive to knock on doors and find out who landlords and property owners are because it's very difficult to find that; and, then, he being a Mexican, he was able to deal on ground far more advantageously than I had been up to this point. Every time I got a piece of ground I wanted, the price and the prices was raised on me; the minute I indicated any interest in that piece of property, why it seemed like I would have the price exploited. So Mr. Vorhauer indicated that through this operation that if I proved out, if I could come up with the leases, that he could come up with the ground and the construction and we would in effect split profits, but we would keep re-investing in more and more Pizza Huts or more and more taco places or more and more restaurants of any nature. The reason I have knowledge that Mr. Vorhauer received money from this was that it was through his representatives that he located this piece of property, this along with the others that were offered in that area.

"Q. And how much did Mr. Vorhauer receive as a part of this closing, how much are you aware of that he received?

"A. I think the property in question, Mr. Vorhauer was either able to either purchase or option this somewhere in the fifty thousand dollar range.

"Q. So that, then, he turned around and sold it to Hassur for eighty thousand eight hundred dollars?

"A. That's correct.

"Q. And when did you become aware that this was happening?

"A. I was aware of it from the very outset.

"Q. From the beginning?

"A. Yes, because this piece of property I also offered to Mr. Hassur on a landlord basis at the eighty-eight thousand dollar price.

"Q. And did you share in any of the profits with Mr. Vorhauer?

"A. I did indirectly.

"Q. And how much did you receive?

"A. Mr. Vorhauer lent me sixteen thousand dollars, which I spent on expenses in the subsequent six months of development, for which I gave Mr. Vorhauer a note and so forth.

"Q. Well, as I understand it, at the time of this transaction you and Mr. Vorhauer had agreed to become partners?

"A. That's correct.

. . . .

"Q. Well, as far as you were concerned, you were participating in the increase between the amount that was being paid for the property and the amount that it was being sold to Mr. Hassur for, isn't that correct?

"A. It was my understanding that the difference between what Mr. Vorhauer was buying the property for and what Mr. Vorhauer was selling the property for, this sum would be used for development of our joint venture, right.

"Q. Now, did you tell Mr. Hassur anything about your relationship with Mr. Vorhauer as it applied to this piece of property?

"A. He never asked.

"Q. Did you ever advise him—(interrupted)

"A. No.

"Q. —(continuing) of your interest?

"A. No.

. . .

"Q. You received sixteen thousand dollars from Mr. Vorhauer?

"A. Right.

"Q. In cash?

"A. Right.

"Q. And he received an equal amount?

"A. Well, since Mr. Vorhauer was either the optionee or the owner, then he would have received the total amount, I mean he would have had the eighty-eight thousand dollars.

. . . .

"Q. He purchased the property for fifty-six thousand dollars?

"A. So he told me.

"Q. And so there was approximately thirty-two thousand dollars to split?

"A. That's correct.

"Q. And you got sixteen thousand and he got sixteen thousand?

"A. Yes.

"Q. And at no time did you relate this interest that you had to Mr. Hassur?

"A. No."

Later in the deposition during cross-examination by his own counsel Henderson gave the following testimony:

"Q. (Mr. Grimes) In connection with the plans that you and Mr. Vorhauer had for some other future development in Mexico, was there ever any discussion

concerning your sharing in his construction company profits on buildings he might build for Hassur or anyone else?

"A. That's correct.

"Q. What do you recall?

"A. We would share in the profits of any ventures that we went into fifty-fifty.

"Q. That would include construction profits through his construction company?

"A. Right.

"Q. And did you ever share in any such?

"A. I did not.

. . .

"Q. Did Mr. Vorhauer build for Mr. Hassur any of the Mexico Pizza Huts?

"A. Yes, he did.

"Q. Do you know which one?

"A. He built the Satellite City, he built the Acapulco, and he either built or supervised the construction of the one in Monterrey, and he supervised the remodeling of the shell in the shopping center in Guadalajara.

"Q. So far as you know, the four locations you were involved in obtaining, Mr. Vorhauer was involved in the area of construction as well?

"A. Right."

In addition to the admissions in the above testimony it was admitted by Henderson that Hassur had paid him $16,000.00 for locating the four building sites in Mexico.

Henderson by his own admissions had entered into an arrangement with a third party, Vorhauer, to purchase and then resell the property to his principal. In this undisclosed arrangement with Vorhauer, Hassur, his principal, paid $32,000.00 above the actual purchase price and the agent, Henderson, either received or shared in this undisclosed profit. In addition, Henderson as agent was receiving $4,000.00 site fees on each of the four locations in which Pizza Hut restaurants were to be built by Vorhauer for Hassur. Henderson had also entered into an agreement with Vorhauer to split the net profits from the construction of the buildings on these four sites.

Based upon Henderson's admissions the trial court held, as a matter of law, that Henderson had been an unfaithful agent. The court entered partial summary judgment in favor of Hassur and against Henderson on the counterclaim. The court awarded Hassur $32,000.00, plus interest, this being the difference between the $88,000.00 he had paid for the Satellite City site and its "true cost" of $56,000.00. The court also held Henderson liable for the return of the $16,000.00 he and Perry had received for their site finding services. The court further held that Hassur was not

required to pay them one percent of the gross profits as agreed in the agreement establishing the agency. It should be noted the trial court found that Perry had no knowledge of or involvement in the unfaithful servant matters. The court held, however, that Perry was vicariously liable for the acts of the joint venture. The court then awarded him indemnification from Henderson. The result was an obligation on Henderson to refund the entire $16,000.00 in commissions.

The relationship existing between a principal and agent is a fiduciary one demanding trust and confidence, and requiring of the agent the same obligation of individual service and loyalty as is imposed upon a trustee in favor of the beneficiary. *Merchant v. Foreman,* 182 Kan. at 556. In all business transactions affecting the subject matter of an agency, it is the duty of the agent to act in good faith and with loyalty to further advance the interests of the principal. *Gillies v. Linscott,* 94 Kan. 217, 219, 146 Pac. 327 (1915), and *Merchant v. Foreman,* 182 Kan. at 556. Where a fiduciary relationship is established the law views with suspicion all dealings in the subject matter of the agency to see that the agent has dealt in good faith and fairness, and that the agent has given the principal the full benefit of his knowledge and skill. If it appears the agent has been guilty of concealment, unfairness or has taken advantage of the confidential relationship, the advantage gained will not be allowed to stand. One who acts as an agent for and deals with his principal in the subject matter of the agency cannot take advantage of his principal by withholding information on the known value of property which the principal desires to acquire. Restatement (Second) of Agency § 390, comment: *a* (1958).

Considering the admissions of Henderson in his deposition and the law stated above we conclude the trial court properly held as a matter of law Henderson violated a fiduciary duty owed to his principal, Hassur.

The question which necessarily follows concerns the amount of actual damages awarded by the trial court on the basis of the deposition testimony of Henderson. Appellant objects to that portion of the judgment which is based on the difference between what Hassur paid for the Satellite City property ($88,000.00) and the amount for which Vorhauer and Henderson had acquired it ($56,000.00). Appellant first complains that there is no evidence

in the record as to the actual market value of the property, and thus no damage has been proven.

Appellee's cause of action is not predicated on loss of value caused by appellant's conduct. It is based upon the duty of an agent to disgorge any secret profits he has received in conducting his principal's business. An agent who makes a secret profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal. Restatement (Second) of Agency § 388 (1958). See also 3 Am. Jur. 2d, Agency § 223.

Appellant Henderson is therefore obligated to account to his principal Hassur for the secret profit he either received or which was deposited to his credit arising from the sale of the Satellite City property.

Appellant next contends the trial court erred in holding him liable for the entire $32,000.00 when the evidence indicates he personally received only $16,000.00. According to the deposition testimony, Vorhauer and Henderson had agreed the entire markup would be used to further their joint venture, that of constructing Pizza Hut restaurants on sites in Mexico including the four to be operated by Hassur. Henderson testified Vorhauer "loaned" him $16,000.00 for use in the development of the venture. Under this testimony Henderson received $16,000.00 as a loan and the loan was eventually forgiven by Vorhauer. When an agent participates in a scheme and obtains a secret profit from the subject matter of the agency at the expense of the principal the agent should be required to account not only for profits going directly into his pocket but also for those going into the assets of a venture in which he has an interest and by which he may expect to share profits. In the present case appellant expected to profit from the entire $32,000.00 and should be made to account to his principal for the entire sum.

It is further argued that the trial court erred in including in the judgment the entire $16,000.00 which was paid to Henderson and Perry for locating and securing sites in Mexico.

An unfaithful servant forfeits the compensation he would otherwise have earned but for his unfaithfulness. This court considered this legal principle in *Bessman v. Bessman*, 214 Kan. 510, 520 P.2d 1210 (1974), where it is held:

"As a general rule an agent who realizes a secret profit through his dealings on

behalf of his principal not only must disgorge the profit but also forfeits the compensation he would otherwise have earned." Syl. ¶ 3.

"Dishonesty and disloyalty on the part of an employee which permeates his service to his employer will deprive him of his entire agreed compensation, because he has failed to give the stipulated consideration for the agreed compensation, and because he cannot be paid for his own wrongdoing." Syl. ¶ 4.

See also Restatement (Second) of Agency § 469 (1958).

Appellant says, assuming arguendo he did breach his fiduciary duty, any such breach related solely to the one transaction, Satellite City. He concludes, if he was unfaithful as to only one of the four transactions, his compensation should be forfeited for only one transaction. *Bessman v. Bessman,* 214 Kan. 510, Syl. ¶ 5.

The trial court concluded, however, that the unfaithfulness permeated all the transactions in question. In this regard the court made the following finding:

"The court does further find that the second secret illicit agreement to share in the construction profits from all four sites permeated the entire transaction as regards the remainder of the sites."

Although we find no evidence that Henderson received any secret profits from the construction business of Vorhauer, it is clear from Henderson's deposition testimony that he exacted an agreement from Vorhauer to share in said profits. This was a violation of his fiduciary duty whether profits were actually received or not.

The final point of alleged error bearing on the judgment for actual damages concerns the allowance of prejudgment interest on the sums previously discussed. Rules concerning prejudgment interest are set out in *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977), as follows:

"As a general rule prejudgment interest is not allowable on a claim for unliquidated damages." Syl. ¶ 10.

"The general rule calling for the disallowance of interest on unliquidated damages is subject to the qualification that, where necessary to arrive at full compensation, a court may in the exercise of its discretion award interest or its equivalent as an element of damages even where the primary damages are unliquidated." Syl. ¶ 11.

"Where a party retains and makes actual use of money belonging to another, equitable principles require that it pay interest on the money so retained and used." Syl. ¶ 12.

In the present case the amounts due from the unfaithful agent were liquidated. The amount of the secret profit to be disgorged

was $32,000.00. The compensation he would have otherwise earned on the four sites was $16,000.00 plus one percent (1%) of the gross receipts. The percentage of gross receipts was not paid to him so the $16,000.00 figure was a liquidated sum. In addition these were sums of money which Henderson had no right to keep and on equitable principles recognized in *Lightcap* he should be required to pay interest on said sums retained and used in violation of his fiduciary duty.

The appellant argues next that the district court erred in holding a jury trial on the sole issue of punitive damages. A strong argument is made that plaintiff Henderson was placed in a position of having been branded by the trial judge as guilty of wrongdoing, and thereafter a fair trial was impossible on the sole issue of punitive damages.

It is quite common to have a trial court enter summary judgment, interlocutory in character, on the issue of liability and then try the issue of the amount of damages, and K.S.A. 60-256(*c*) authorizes said procedure.

We note also that K.S.A. 60-256(*d*) provides:

"If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the actions as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."

Under the direction of this statute the trial court is given authority to ascertain what material facts exist without substantial controversy and make an order directing the extent to which the amount of damages or other relief is not in controversy. In the present case the trial court determined that actual damages were due and that the amount thereof was "without substantial controversy." After making these determinations the only issue remaining was punitive damages. The procedure in the trial court may have tended to the disadvantage of Henderson. However, as the facts unfolded there was little doubt that the basis of the judgment for actual damages had been admitted by Henderson. Under the facts and circumstances the district court did not err in holding a jury trial on the sole issue of punitive damages.

Appellant contends the district court erred in restricting questions relating to Hassur's key witness, Jose Vorhauer. Mr. Hassur was asked if he had made a claim against Vorhauer for any money Vorhauer received out of the Satellite City transaction. After he answered in the negative, an objection on the ground of immateriality was sustained to further questions along this line.

K.S.A. 60-405 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

In the present case the appellant claims he was attacking the credibility of Hassur's key witness. However, at the trial when the objection was sustained no reasons were given for this line of questions and no proffer was made as to what the testimony might establish. Considering the record we are unable to find error.

The trial court instructed the jury that it could consider the amount of actual damages already awarded by the court in determining the amount, if any, of punitive damages. Appellant's attorney, questioning his client, attempted to elicit opinion testimony as to the probable sum one percent of the gross receipts from the four Pizza Hut restaurants would have totaled. The one percent provided for in the agreement for agency was ordered forfeited by the court, but the amount in dollars was never determined. There was nothing before the court to indicate that Henderson had any basis or foundation for the figure of one hundred thousand dollars which he attempted to get into evidence. No proper foundation was established to support the answer and the court did not err in refusing to admit his conjecture into evidence.

Appellant has two complaints on jury instructions. The first concerns an instruction on the duty of a broker. The second complaint involves a refusal to give a definition of the term "mitigating circumstances" as suggested by the appellant.

The general principles to determine whether instructions of a trial court are in error are set forth in *Bechard v. Concrete Mix & Construction Inc.,* 218 Kan. 597, 545 P.2d 334 (1976).

The instruction objected to was a correct statement of the law as

to the duty of a broker. It was submitted to counsel for both the plaintiff and the defendant in advance. The following discussion concerning the instruction took place in the court's chambers:

"THE COURT: Mr. Grimes, would you please state any objections that you might have to the proposed Instructions?

"MR. GRIMES: First, we object to the inclusion of number two, which defines for the jury the duties of a broker, when the Court has already determined the violation of that duty, and there is no issue concerning that before this jury, and it may tend to confuse—

"MR. FISHER: (Interrupting) Should I respond as we go along?

"THE COURT: Yes, I think, for the record.

"MR. FISHER: We discussed it at length off the record, but we call attention to the Court that the jury can't really find if this has been a willful, or deliberate, or reckless, or other breach of a duty without knowing the duty; and therefore, we think it's absolutely essential that the Instruction, such as number two, be included."

The chief function of instructions is to give the jury proper guidelines for considering the issues in the case and to advise the jury regarding possible verdicts. Another function of the instructions is to inform the jury of any duties resting on the parties. In this case the breach of a duty was the basis for the lawsuit. Since the breach had to be willful, malicious or wanton it was proper to instruct the jury on the extent of the particular duty. Before the jury could properly consider the evidence and determine whether Henderson had acted in an improper fashion, it had to understand the duty running from Henderson to Hassur. The instruction was proper.

The instruction appellant requested on mitigating circumstances reads as follows:

"Mitigating circumstances, as those words are used in the previous Instruction, may include evidence that the wrong complained of was a result of an accident, that it was committed unintentionally, or through an honest mistake, or that James Henderson acted in good faith and in honest belief that he was justified in doing what was done."

When appellant proffered this instruction it was refused. There was no evidence in the record to support a finding that the acts of Henderson were accidental or were committed unintentionally. The instruction was not supported by evidence and consequently it was not error to refuse the same.

Appellant complains of the use of certain deposition testimony of James D. Henderson which is alleged to have been obtained in violation of an agreement limiting the scope and purpose of the

deposition. The deposition was the second of two depositions taken from appellant. The question here raised was argued before the trial court. The court did not see fit to impose sanctions against use of the deposition. K.S.A. 60-232(*a*)(2) provides:

"The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under K.S.A. 60-230 or 60-231 to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose."

This was the deposition of a party. The use of such a deposition is not restricted by statute, and when limited by stipulation of the parties the limitation imposed must be construed and applied by the trial court. The matter is largely one of trial court discretion. After considering the stipulation and the use made of the deposition testimony we cannot say there was an abuse of discretion by the trial court which resulted in reversible error.

The appellant contends that prejudicial statements were made by Hassur's counsel which justify a new trial because of prejudice resulting from said statements. Three separate statements, made during closing arguments, are the basis for this claim of error. The first statement charged that Henderson had violated the law and filed false income tax reports. On objection the jury was instructed to disregard the statement as being inflammatory. The second statement consisted of a story about catching monkeys told by counsel in which he indicated that Henderson was caught by reason of greed. On objection the jury was instructed to disregard the statement of Henderson's greed as being inflammatory. The third statement made reference to the national scandal known as Watergate and likened the actions of Henderson to those who participated in the scandal of Watergate. There can be little doubt as to the impropriety of an attorney referring to the opposing party as a criminal. *Donley v. Amerada Petroleum Corp.,* 152 Kan. 518, 106 P.2d 652 (1940). However, a more difficult assessment in such cases comes when a court attempts to decide whether improper remarks in a closing argument may have resulted in prejudice. Remarks of counsel result in reversible error when, because of them, the parties have not had a fair trial. *Smith v. Blakey, Administrator,* 213 Kan. 91, 515 P.2d 1062 (1973). It is the collective judgment of the members of this court that remarks of counsel did not result in an unfair trial so as to amount to reversible error.

The final point concerns alleged error in refusing to set aside a $215,000.00 jury verdict for punitive damages. It is difficult, if not impossible, to lay down precise rules by which to test the question of when a verdict for punitive damages is excessive. *Motor Equipment Co. v. McLaughlin,* 156 Kan. 258, 273, 133 P.2d 149 (1943). Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. *Koch v. Merchants Mutual Bonding Co.,* 211 Kan. 397, 402, 507 P.2d 189 (1973). The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Will v. Hughes,* 172 Kan. 45, 55, 238 P.2d 478 (1951). In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses. *Ayers v. Christiansen,* 222 Kan. 225, 229, 564 P.2d 458 (1977).

With the above principles in mind let us consider some additional pertinent evidence which was before the jury. Jose Vorhauer testified concerning the transactions. He was a contractor who had built plants for Goodyear, Dupont, Firestone and Massey-Ferguson in Mexico. He testified that he owned a real estate company, Encasas, S.A., which figured in the purchase of the Satellite City site. Vorhauer was acquainted with Mrs. Parker, a Canadian, who owned the site. Vorhauer talked with her about a sale and then talked with Henderson. Vorhauer testified at the trial as follows:

"A. That's right. So, then, I told Mr. Henderson, 'The price is six hundred thousand pesos.' Keep in mind up to then, I was interested only in the construction of the Pizza Hut, because they were supposed to buy more sites, and they spoke about even building one hundred of them; so to me, it was an attractive proposition. So when I told Henderson the price is six hundred thousand, he said to me, 'Wait a minute. We can sell this to Mr. Hassur for one million one hundred thirty-six thousand pesos.' I said, 'Well, that's more than enough. You don't have to raise it.' He said, 'So what? We will split it,' and I said, 'Well, I don't know if the

lady who owns the land wants to go along with it under those lines.' He said, 'Talk to her.' So I talked to Mrs. Parker, and she said, 'Okay, I'll be willing to get the check for one million one hundred thirty-six thousand pesos if you give me fifty thousand more for myself.' Well, Henderson and I talked it over and he agreed; so she was going to get six hundred fifty thousand pesos for her lot.

"Q. All right, sir, how was that transaction handled with respect to the paper work?

"A. Well, there was a possibility of losing the property because there was other people interested; so I took an option on the property under the name of Encasas, S. A.

"Q. Whose idea was it to put the title option in Encasas?

"A. Henderson's.

"Q. All right, sir, and tell me, after you took that option, then what did you do?

"A. Well, then Hassur got in touch with—I mean Mr. Henderson got ahold of Mr. Hassur and told him he had found the right property; that the price was one million one hundred thirty-six thousand; that he recommended very strongly to purchase it.

. . . . .

"So then the day of the transaction was made, they gave Mrs. Parker a check for one million one hundred thirty-six thousand. Maybe I'm wrong by a few dollars, more or less. Mrs. Parker took the check. We went out, Mrs. Parker, Mr. Henderson, and myself, we went to the Bank of the Commercial, and we changed the check. The manager of the bank did me that favor. He gave Mrs. Parker a check for six hundred fifty thousand, and the rest was given to us.

"Q. Was it given to you in check or cash, sir?

"A. In cash.

"Q. And that amounted to how many dollars in cash?

"A. $32,000.

"Q. And then what was done with that $32,000, Mr. Vorhauer?

"A. I gave Mr. Henderson in person—and he knows it—$16,000.

"Q. When you gave it to him, did he have some kind of request as to how it would be handled that was unusual?

"A. Well, he asked me to sign a receipt in which it appeared like if I loaned him $16,000, and I said, what is this for?' 'That way I don't have to pay taxes, and this will show how I got this money, because you loaned it to me.' 'Well, why should I loan it to you? That's not correct. Anybody who reads this receipt would ask how I loaned you that money.' 'Well, out of this transaction, you'll loan me $16,000.' I said, 'Well, don't you think that if you're being paid by a man who sent you here to Mexico, it's going to look very funny that you received from me $16,000 on the purchasing of the land, that you're partly getting a commission or a fee?' He said, 'Well, I've discussed this with him along these lines. There will be no problem. You go ahead and sign this receipt and forget it.' I said, 'Well, if that's the way you want to look at it.' So the next day, he left, and that was the last I saw of Henderson for some time.

"Q. Now, Mr. Vorhauer, if I translate that right, a million one hundred thirty-six thousand pesos, more or less, translates to approximately $88,000?

"A. $88,000.

"Q. And the property then in dollar amounts was sold for $88,000.

"A.  That's right.

"Q.  To Hassur, but it was purchased, as I understand it, if my translation again is correct, from Mrs. Parker for $56,000?

"A.  That's right.

"Q.  That means $32,000 difference?

"A.  That's right.

"Q.  And that was the amount that was split?

"A.  Yes.

"Q.  And incidentally, did you and Mr. Henderson have some agreement with respect to construction of Pizza Huts at this same time, sir, and what would happen to the profits of the construction, as well as any profits that might be made from land acquisitions?

"A.  Well, we were going to be sort of partners in the construction.

.   .   .   .

"A.  It was a verbal agreement that we will split.

"Q.  All right, sir. Now, did you, likewise, have an agreement that you would split the proceeds of any gain that was made from land acquisition?

"A.  Yes, we made that agreement.

"Q.  Did Henderson ever disclose to you he was being paid $4,000 per site, to acquire sites?

"A.  No, he never told me that."

This testimony of Vorhauer, when reinforced by that of Henderson, placed Henderson in a very poor light. There could be little doubt that Henderson violated his fiduciary duty to his principal and did so willfully, wantonly and secretly.

During the trial there was introduced a verified financial statement of James D. Henderson listing total assets of $1,116,068.00, liabilities of $46,719.00, leaving a net worth of $1,069,349.00. This evidence would explain to some extent the size of the jury's verdict.

In addition there were received in evidence copies of an original and an amended income tax return which had been filed by Henderson and his wife for the year 1969. This was the year of the sale of the Satellite City property on which a $32,000.00 markup was realized. The original return did not report the $16,000.00 which had been received personally by Henderson. The amended return filed several years after 1969 showed a $16,000.00 addition to income explained as follows:

"Cancellation of indebtedness.

"Loan from Jose Vorhauer obtained for business purposes. Later cancelled. Only recently was it discovered that this should have been reported in 1969        $ 16000.00"

These returns further confirmed the basis on which the jury's verdict for punitive damages rests.

No passion or prejudice on the part of any of the individual members of the jury is shown by definitive proof. It is only alleged and it depends for support solely on the amount of the verdict. Generally, a trial court will not be reversed for refusing a new trial based on the size of the verdict unless the amount of the verdict in the light of the evidence shocks the conscience of the appellate court. *Kirk v. Beachner Construction Co., Inc.,* 214 Kan. 733, Syl. ¶ 1, 522 P.2d 176 (1974); *Slocum v. Kansas Power & Light Co.,* 190 Kan. 747, 378 P.2d 51 (1963); *Neely v. St. Francis Hospital & School of Nursing,* 188 Kan. 546, 363 P.2d 438 (1961).

When trial is to a jury, the law entrusts the amount of exemplary damages to the good conscience and common judgment of the jurors. When a jury has returned a verdict there is a presumption it acted reasonably, intelligently and in harmony with the evidence. On the record before us the amount of exemplary damages allowed appears to approach the outer limits but we cannot say the amount is such as to shock the conscience of this court. We hold the verdict is not excessive.

The judgment is affirmed.