(638 P.2d 946)
No. 52,104

KERNIE W. BINYON and HILDA BINYON, *Appellees,* v. ROY NESSETH, *et al., Appellant.*

Opinion filed December 23, 1981.

*Martin E. Updegraff,* of Vaughn & Updegraff, of Wichita, for the appellant.

*Robert T. Cornwell* and *James L. Burgess,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for the appellees.

Before FOTH, C.J., presiding, TERRY L. BULLOCK, District Judge, and FREDERICK WOLESLAGEL, District Judge Retired, assigned.

FOTH, C.J.: Defendant Roy Nesseth appeals from a default judgment rendered against him for $9,326.06 actual and $100,000.00 punitive damages for fraud in the leasing of an automobile to plaintiffs. He raises three contentions: (1) Default should not have been ordered as a sanction for his refusal to permit discovery; (2) he was given inadequate notice of the proposed entry of the default judgment; and (3) the punitive damages were excessive.

The facts are set out in the journal entry of judgment and are undisputed:

"2.  At all times material hereto, Dr. Kernie W. Binyon, was the sole owner of Kernie W. Binyon, P.A.

"3.  Dahlinger Fleet Leasing, Inc., is not and never has been a corporation, but is an assumed name under which Dahlinger Pontiac-Cadillac, Inc., hereafter called Dahlinger, has done business.

"4.  On July 15, 1976, Dr. and Mrs. Binyon went to the principal place of business of Dahlinger, to attempt to purchase a new Cadillac. After discussing the proposed purchase with Jack Lindsey, hereafter called Lindsey, an employee of Dahlinger, Dr. and Mrs. Binyon inquired as to the cost of leasing said automobile. Lindsey told Dr. and Mrs. Binyon that he did not have any authority to commit Dahlinger on a lease and took them to James R. Cole, an employee of Dahlinger, who was authorized to enter into leases of automobiles on behalf of Dahlinger.

"5.  After discussions between Mr. Cole and Dr. and Mrs. Binyon, on July 15, 1976, at some time after 5:00 p.m., Dahlinger agreed to lease to and Dr. and Mrs. Binyon agreed to lease from Dahlinger, a 1976 Cadillac Fleetwood El Dorado, hereafter called said Cadillac, for a monthly rental of Three Hundred Seventy-one Dollars Forty Cents ($371.40), for a period of two (2) years, on the condition that Dahlinger was to pay the Personal Property Taxes on said Cadillac during the lease and was to furnish to Dr. and Mrs. Binyon a license tag for said Cadillac, and at the expiration of said lease, Dr. and Mrs. Binyon were to have the right to purchase said automobile for Five Thousand Two Hundred Dollars ($5,200.00).

"6.  At the time the lease mentioned in the immediately preceding paragraph was made, it was after 5:00 p.m., and all of the clerical employees of Dahlinger had left for the day. At the request of Dahlinger, Dr. and Mrs. Binyon signed a printed form lease, without any of the blanks or the terms and conditions of said lease being completed, upon the representation of Dahlinger that the lease would be completed in accordance with the terms contained in the immediately preceding paragraph, and Dr. and Mrs. Binyon left the agency with said Cadillac.

"7.  On July 15, 1976, said Cadillac was a new automobile, was not covered by a Certificate of Title and did not have a license tag attached thereto. Dahlinger furnished Dr. and Mrs. Binyon dealers' stickers that permitted them to drive said Cadillac, for several weeks from and after July 15, 1976, at which time Dahlinger furnished Dr. and Mrs. Binyon a license tag for said Cadillac.

"8. Dr. and Mrs. Binyon timely made all twenty-four (24) of the monthly payments required by said lease.

"9. At all times material hereto, Roy Nesseth, hereafter called Nesseth, was the principal owner and operator of Dahlinger and had the complete control thereof.

"10. Shortly after July 15, 1976, Nesseth was informed of the terms and conditions upon which Dahlinger had leased said Cadillac to Dr. and Mrs. Binyon. When he was so informed, Nesseth stated to some employees of Dahlinger that he thought that Dr. and Mrs. Binyon should be required to pay the Personal Property Taxes on said Cadillac and for the license tags used thereon. Nesseth never communicated this thought to Dr. or Mrs. Binyon. The employees of Dahlinger told Nesseth that the lease to Dr. and Mrs. Binyon provided that Dahlinger was to pay said Personal Property Taxes and for the license tags for said Cadillac.

"11. Dahlinger received monthly lease payments from Dr. and Mrs. Binyon, without advising them that Nesseth thought they should pay the Personal Property Taxes on said Cadillac and for the license tags thereon.

"12. During October of 1976, for valuable consideration paid in cash to Dahlinger, Nesseth executed documents assigning the monthly payments due under said lease and, in the event Dr. and Mrs. Binyon exercised the option to purchase said Cadillac, the above-mentioned Five Thousand Two Hundred Dollars ($5,200.00), to General Motors Acceptance Corporation, hereafter called G.M.A.C.

"13. During the first part of 1978, the license tag for said Cadillac furnished to Dr. and Mrs. Binyon by Dahlinger expired. Dr. and Mrs. Binyon requested Dahlinger and Nesseth to furnish them a current license tag. Nesseth refused to do so. Dr. and Mrs. Binyon attempted to purchase tags, but could not do so because the Personal Property Taxes on said Cadillac had not been paid. Dr. and Mrs. Binyon attempted to pay the Personal Property Taxes on said Cadillac, in order that they could purchase a license tag, but they could not legally pay said Personal Property Taxes.

"14. Dr. and Mrs. Binyon were deprived of the use of said Cadillac from May of 1978 to February of 1980, because it was not legal to drive the same without license tags thereon.

"15. Through the intervention of this Court, G.M.A.C. finally received a Certificate of Title to said Cadillac and, during February of 1980, assigned said Certificate of Title to Dr. and Mrs. Binyon, upon the payment of the above-mentioned Five Thousand Two Hundred Dollars ($5,200.00).

"16. During the time that Dr. and Mrs. Binyon were deprived of the use of said Cadillac, by the foregoing wrongful acts of Nesseth, they put said Cadillac in storage, which cost them Seven Hundred Thirty-five Dollars ($735.00); they kept said automobile insured against fire and theft, which cost them Five Hundred Eleven Dollars Twenty Cents ($511.20); and they were deprived of the use thereof, which had a fair and reasonable value of Seven Thousand Eight Hundred Seventy-five Dollars ($7,875.00).

"17. During the terms of said lease, on numerous occasions, Mrs. Binyon requested Dahlinger to furnish her the warranty book covering said Cadillac, which would have permitted certain repairs to be made without charge to Dr. and Mrs. Binyon. Nesseth refused and failed to furnish said warranty book to Dr. and Mrs. Binyon. During the term of said lease, Dr. and Mrs. Binyon were required to

pay Two Thousand Four Dollars Eighty-six Cents ($2,004.86) for repairs on said Cadillac, which they would not have been required to pay if Dahlinger had furnished them said warranty book.

. . . .[1]

"27. Although Nesseth knew that said Cadillac had been leased to Dr. and Mrs. Binyon on the basis that Dahlinger would pay the Personal Property Taxes on said Cadillac and for the license tags thereon, and although the final completed version of the lease on said Cadillac retained by Dahlinger in its files provided that Dahlinger was to pay said Personal Property Taxes and for said license tags, Nesseth caused a lease to be completed and furnished to Dr. and Mrs. Binyon that provided that Dr. and Mrs. Binyon were to pay said Personal Property Taxes and for said license tag, for the purpose of defrauding and misleading Dr. and Mrs. Binyon.

"28. The foregoing acts, omissions and refusals to act of and by Nesseth, were done maliciously, fraudulently and willfully, with total and wanton disregard for the rights of Plaintiffs, were oppressive and unlawful and were done for the purpose and intent of defrauding Plaintiffs, for his own personal benefit and gain.

"29. At all times material hereto, Nesseth has controlled Dahlinger; as the alter ego of Dahlinger, Nesseth has, at all times material hereto, conducted, managed and controlled the affairs of Dahlinger as though it were his own business; at all times material hereto, Nesseth has diverted funds and assets of Dahlinger to his own personal use; and at all times material hereto, Nesseth has used Dahlinger for the purpose of defrauding Plaintiffs and others similarly situated."

## I. Sanctions

The following chronology of events led to the declaration of default:

August 4, 1978, suit filed.

December 18, 1978, answer and counterclaim of the corporate defendant Dahlinger Pontiac-Cadillac, Inc.

January 11, 1979, plaintiffs serve and file interrogatories, request for admissions, and request for production and inspection, together with notice to take deposition of Nesseth which was filed on January 12.

January 9, 1979, personal service on Nesseth.

February 8, 1979, answer and counterclaim of Nesseth.

February 21, 1979, plaintiffs' motion to compel discovery.

February 22, 1979, answers to interrogatories, etc., signed only by Nesseth's counsel. Many were not answered because counsel lacked the necessary knowledge.

March 2, 1979, first order to Nesseth, to be deposed on March 5 and answer interrogatories and produce documents by March 8.

March 7, 1979, Nesseth's time extended by order to March 13.

---

[1] Additional facts found in paragraphs 18 through 26 cover Nesseth's relationship to the corporate defendant and his dealings with third parties. Those findings will be discussed later.

March 13, 1979, Nesseth's deposition adjourned when Nesseth asks his counsel to object to any more questions and counsel directs him not to answer any more questions.

March 14, 1979, order to Nesseth to answer questions.

March 23, 1979, Nesseth ordered to answer interrogatories and request for admissions by March 29.

March 30, 1979, Nesseth ordered to answer interrogatories and request for admissions by April 12, 1979, be deposed on April 26, 1979.

April 13, 1979, second order to Nesseth to be deposed on April 26, 1979.

April 20, 1979, order to Nesseth to file answers and produce specified documents by May 11, and to be deposed during week of May 21, 1979. The court found two weeks to be ample time to produce the documents but permitted three; remarked on Nesseth's previous recalcitrance and plaintiffs' patience; and specifically admonished Nesseth's counsel to warn him that failure to comply would result in sanctions. Petition amended to add charge of fraud and prayer for punitive damages.

May 11, 1979, Nesseth's answers to interrogatories filed.

May 14, 1979, plaintiffs' motion for sanctions filed.

June 8, 1979, motion for sanctions heard. The court noted that even though Nesseth had responded to the interrogatories the answers were evasive and incomplete, much like the answers given in his deposition. The court specifically found:

"I do think that sanctions are appropriate and I think severe sanctions are appropriate in this matter because my sense of it is that Mr. Nesseth has, *with some deliberation and action on his part, attempted to frustrate the progress of the lawsuit by frustrating the discovery* . . . ." Emphasis added.

The court went on to strike the defendant's answer and counterclaim and ruled he would not allow Nesseth to introduce evidence or present any defense in opposition to default judgment to be considered by the court at a future time with evidence.

The general principles governing sanctions for refusal to make discovery were well summarized in *Lorson v. Falcon Coach, Inc.,* 214 Kan. 670, 522 P.2d 449 (1974):

"In determining the sanctions to be imposed under K.S.A. 60-237 for the failure of a party to comply with rules of discovery, the presence or lack of good faith is relevant to the orders which should be given and the severity of the sanctions imposed."

"The sanction of judgment by default for refusal to make discovery under

K.S.A. 60-237 is the most severe sanction which a court may impose and its use must be tempered by the careful exercise of judicial discretion to assure that imposition thereof is merited. However, where there is evidence that a party has acted in deliberate disregard of reasonable and necessary orders of a court, and where such party is afforded a hearing and an opportunity to offer evidence of excusable neglect, the imposition of a stringent sanction will not be disturbed." Syl. ¶¶ 2 and 3.

See also *Vickers v. City of Kansas City,* 216 Kan. 84, 531 P.2d 113 (1975); *Williams v. Consolidated Investors, Inc.,* 205 Kan. 728, 472 P.2d 248 (1970); *Mansfield Painting & Decorating, Inc. v. Budlaw Services, Inc.,* 3 Kan. App. 2d 77, 589 P.2d 643, *rev. denied* 225 Kan. 844 (1979); *Fields v. Stauffer Publications, Inc.,* 2 Kan. App. 2d 323, 578 P.2d 1138, *rev. denied* 225 Kan. 843 (1978); *Prather v. Olson,* 1 Kan. App. 2d 142, 562 P.2d 142 (1977).

To the general principles *Fields* adds that the ultimate sanction of default is justified when, to bad faith, there are added that (a) the information sought is dispositive of the issue and (b) it cannot reasonably be acquired through alternative means. 2 Kan. App. 2d at 329. See also *Independent Mfg. Co. v. McGraw-Edison Co.,* 6 Kan. App. 2d 982, 637 P.2d 431 (1981).

Here the information sought included the dealership's copy of the lease contract demonstrating the fraudulent alterations, documentation of Nesseth's relationship with the corporate defendant which would justify piercing the corporate veil, and the certificate of title to the Cadillac. All were essential to plaintiffs' case; all were in Nesseth's control — at least until he passed the certificate of title on to GMAC. The other documents he claimed to have given to a bookkeeper in Arizona, whose address he could not furnish.

We conclude that all the prerequisites for imposing the sanction of default were present: There was a deliberate and contemptuous disregard of the discovery orders; the documents sought related to dispositive issues; they were not otherwise available; and the defendant was afforded a hearing at which he could have offered evidence of excusable neglect.

In his brief Nesseth now asserts that the documents sought went only to the punitive damage and personal liability issues injected into the case for the first time on April 20, and he should therefore have had more time to produce them. This ignores the fact that the ultimate order of April 20 also encompassed "all documents mentioned in Plaintiffs' Interrogatories, Requests for

Admissions and Request for Production and Inspection." These documents had been sought without success for some five months. In addition, the "personal liability-alter ego" issue had been in the case at least since the abortive attempt to depose Nesseth on March 13. Plaintiffs' efforts to secure evidence on that issue had furnished the excuse for breaking off the deposition. The inference is that Nesseth did not intend to disclose the nature of his dealings with the corporate defendant.

We find no abuse of discretion in the sanction imposed.

## II. Notice of Default

The order imposing sanctions on June 8, 1979, was entered under K.S.A. 60-237(*b*)(2)(B) and (C). It provided in part:

"1.   The Answers and Counterclaims of Dahlinger Pontiac-Cadillac, Inc., and Roy Nesseth are stricken.

"2.   Dahlinger Pontiac-Cadillac, Inc., and Roy Nesseth are prohibited from presenting any claims herein and asserting any defenses against Plaintiffs' claims herein and from presenting any evidence relative thereto.

"3.   At a time to be later designated by the Court, a default hearing will be held herein, at which time Plaintiffs will be permitted to introduce evidence in support of their claims against Dahlinger Pontiac-Cadillac, Inc., and Roy Nesseth, after which the Court will enter such default judgment as is supported by such evidence."

Thereafter plaintiffs proceeded by depositions to secure evidence on damages. On March 25, 1980, plaintiffs filed their application for default judgment, with the hearing set for March 28, 1980. Nesseth's counsel having withdrawn, notice was mailed to him personally at his address in California. On March 28, 1980, the court heard extensive evidence relating to actual and punitive damages and then entered the judgment appealed from.

Present counsel then entered the case and filed a motion for relief from the judgment under K.S.A. 60-260(*b*)(4) and (6). The sole ground alleged was that the judgment had been entered "without proper notice to the defendant." In arguing the motion to the trial court counsel conceded:

"I have no legal citations. I think frankly that from the law that I've read on the matter it's a discretionary matter at this point with the Court and that the question of whether or not Mr. Nesseth should have been given notice other than what he was given is something within the discretion of the Court as far as I can tell at this point."

On appeal the argument is somewhat different. He now contends that under K.S.A. 60-206(*e*), since service was by mail, there

should have been an additional three days between service and the hearing.

Assuming the contention is properly before us despite not having been presented to the trial court, we conclude it is without merit. The three additional days is allowed "[w]henever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon him or her . . . ." The statute contemplates that the party served has the right or obligation to do something after being served. Here Nesseth had, by the original order of default, been precluded from taking any part in the hearing on the default judgment. Whatever might have been the case if the default had been under K.S.A. 60-255 for failure to answer, the prohibition against his offering evidence was a sanction authorized by K.S.A. 60-237(b). Had he been present he would have been unable to participate. Hence K.S.A. 60-206(e) had no applicability to the notice sent in this case.

We have had presented to us the opinion of the California Court of Appeal, Fourth Appellate District, in *Binyon v. Nesseth,* (No. 4 Civil 23840, unpublished opinion filed, October 6, 1981). In that case these plaintiffs sought to enforce in California the judgment rendered in this case. Nesseth resisted alleging, among other things, that the inadequacy of the notice given deprived him of due process of law. The trial court there agreed, but on appeal it was held that the procedure followed complied with Kansas law, which was said to be identical with California procedure, and that both met the requirements of due process. Basically, the court held that once defendant is declared to be in default he is not entitled to any notice of subsequent proceedings.

It is urged that we are required to give full faith and credit to the California decision, thus rendering our consideration of the notice issue unnecessary. Be that as it may, we conclude that the failure to give more notice did not deprive the trial court of jurisdiction and it did not abuse its discretion in refusing to set aside the judgment on that ground.

### III. Punitive Damages

The parties agree that for us to find a punitive damage award excessive it must be of a size which "shocks the conscience of the appellate court." *Henderson v. Hassur,* 225 Kan. 678, Syl. ¶ 11, 594 P.2d 650 (1979).

The long standing principles governing punitive damages were restated in *Henderson:*

"It is difficult, if not impossible, to lay down precise rules by which to test the question of when a verdict for punitive damages is excessive. *Motor Equipment Co. v. McLaughlin,* 156 Kan. 258, 273, 133 P.2d 149 (1943). Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. *Koch v. Merchants Mutual Bonding Co.,* 211 Kan. 397, 402, 507 P.2d 189 (1973). The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Will v. Hughes,* 172 Kan. 45, 55, 238 P.2d 478 (1951). In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses. *Ayers v. Christiansen,* 222 Kan. 225, 229, 564 P.2d 458 (1977)." 225 Kan. at 694.

The trial court's findings of malice, fraud, and wanton disregard of the rights of plaintiffs incorporated in finding 28 above, are unchallenged. Evidence at the hearing on the default judgment put Nesseth's net worth at over $1,600,000.00. Actual damages approached $10,000.00. Although we might not have made the "smart" quite so severe, we cannot say our collective conscience is shocked by the amount of the award. *Cf. Townsend v. Seefeld,* 102 Kan. 302, 306, 169 Pac. 1157 (1918).

Nesseth also urges that the amount represents an additional sanction for his refusal to make discovery. We are unable to draw that inference. The trial court's findings clearly reflect its outrage at the cavalier manner in which Nesseth treated the plaintiffs, but there is nothing to indicate that the damage award was increased because of the similar treatment he accorded the court.

There is also a suggestion that the award was improperly based on Nesseth's conduct toward persons other than plaintiffs. Findings 18 through 26, omitted above, recite a pattern of fast dealing with the cash and other assets of the corporate defendant resulting in the expenditure within a year for Nesseth's personal benefit of over $400,000 in corporate funds in addition to his salary or "draw." While these findings may have incidentally shown a fraud upon the corporation's other creditors, we take

their main purpose to have been to demonstrate Nesseth's domination and control of the corporation so as to justify piercing the corporate veil. There is nothing to indicate that damages in this case were awarded for anything other than Nesseth's conduct toward these plaintiffs. We are therefore not called upon to decide whether punitive damages may be based in part on a pattern of conduct not only involving different parties but different in kind from the defendant's conduct toward the plaintiffs. But *cf. Kiser v. Gilmore,* 2 Kan. App. 2d 683, 694, 587 P.2d 911 (1978), *rev. denied* 225 Kan. 844 (1979).

Affirmed.