No. 55,449

PLAINS RESOURCES, INC., *Appellee*, v. JOHN R. GABLE AND EMPIRE OIL & GAS COMPANY, *Defendants,* and EMPIRE DRILLING COMPANY, *Appellant.*

(682 P.2d 653)

Opinion filed June 8, 1984.

*Anne L. Baker,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause and was on the brief for appellant.

*Ken M. Peterson,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Joseph J. Hlavacek,* of the same firm, and *Jack E. Dalton,* of Mangan, Dalton, Trenkle & Rebein, Chartered, of Dodge City, were on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an action for breach of an oil and gas drilling contract, and related tort claims, arising from the drilling of wildcat wells in western Kansas. The drilling contract was between defendant Empire Drilling Company, a contract drilling company, and plaintiff Plains Resources, Inc., an enterprise engaging in exploring for oil and gas production on a wildcat basis. Following a bench trial the district court entered judgment against defendant Empire Drilling Company and defendant Empire Oil & Gas Company, a related corporation, for compensatory damages of $282,569.05, prejudgment interest, punitive damages of $1,000,000 and certain fees and expenses. Empire Drilling Company and Empire Oil & Gas Company appealed from the judgment. The appeal of the latter corporation has been voluntarily dismissed and the matter is before this court on the appeal of Empire Drilling Company (hereinafter referred to as Empire).

As would be expected, the evidence introduced during the trial, which took four weeks, was extensive and complex. The trial court made eighty-eight detailed factual findings. It would be inappropriate to include the same in this opinion in their entirety or to attempt to summarize the entire trial court memorandum opinion. Rather, we will state generally the background of the case and reserve discussion of facets of the evidence until necessary for determination of specific issues.

Plains Resources, Inc. (hereinafter referred to as Plains), obtained leasehold mineral rights on tracts located in Ford and Sherman Counties, Kansas. In 1977 Plains solicited funds from investors for development of the leases. A selling point for the potential investors was that the funds invested would be expended or obligated by the end of the calendar year thereby gaining 1977 income tax advantages for the investors. Plains and Empire entered into a drilling contract in November 1977 whereby Plains prepaid drilling expenses of $795,000. A total of

eight wells were drilled or commenced under the contract with Empire. Six wells were drilled to total depth with Empire deducting expenses therefor from the prepaid funds. Many problems arose during the operation. While Ellis No. 1 was being drilled, an additional difficulty surfaced. Empire advised Plains the prepaid drilling expenses had been exhausted and additional funds would be needed to complete the hole. The funds were not forthcoming. On February 16, 1978, orders were sent to shut down the operation at Ellis No. 1 and Empire removed its equipment from the hole. It was later discovered the hole had been sabotaged. Plains made unsuccessful efforts to salvage Ellis No. 1, and a new well (Ellis No. 1A) was subsequently drilled by another drilling contractor. Plains brought this action for breach of contract seeking compensatory damages arising from inferior performance of the drilling contract and overcharges. Plains further sought compensatory and punitive damages for the sabotage of Ellis No. 1.

We turn now to the issues. The first issue is alleged error by the trial court in relying on certain testimony of plaintiff's expert witness, H. E. Barry, Jr. Mr. Barry owns and operates an oil and gas industry consulting firm based in Oklahoma City, Oklahoma.

As has been previously noted, Plains prepaid drilling expenses to Empire in the sum of $795,000. Empire was drilling the eighth well when the ship hit the rocks, so to speak. As of the time of the shutdown Empire contended it was owed $114,705 by Plains, over and above the prepaid funds. Plains contended it had been overcharged for services performed and charged improperly for items that were not its responsibility and was, in fact, owed a refund by Empire. Accounting procedures employed by Empire were quite deficient. Into this chaotic situation came plaintiff's expert, H. E. Barry, Jr. Mr. Barry's qualifications for the difficult assignment given him are very impressive and are not seriously challenged by Empire. Mr. Barry examined the hundreds of entries and documents relative to the entire drilling operation and, utilizing his expertise, arrived at very definite opinions relative to who owed whom what amounts and why. It is not surprising the trial court relied heavily on Mr. Barry's report and testimony in determining the compensatory damage issues herein. It should be noted Empire did not employ an expert to offer evidence contrary to that of Mr. Barry.

Empire fires no broadsides at Mr. Barry. Rather, it contends that, in certain instances, Mr. Barry testified as to legal opinions and thereby overreached his area of expertise. We do not agree. In determining what were or were not proper charges in this highly specialized field, the expert had, of necessity, to give consideration to what in his expert opinion was encompassed within the contractual obligation of the parties. Illustrative of the complaints made in this regard is Barry's testimony relative to whether Empire had properly charged Plains with paying for rigging up and rigging down at the daywork rate. Another area of complaint is Barry's testimony relative to whether certain rig transportation costs had been properly charged against the Plains account. We have examined all complaints concerning the testimony and report of Mr. Barry and find no error or abuse of the trial court's discretion.

The second issue concerns numerous alleged errors by the trial court in the allowance and computation of the compensatory damages herein. The trial court, as previously noted, made extensive findings of fact and conclusions of law. The parties, of course, are intimately familiar with the evidence, their contentions herein, the basis on which damages were allowed and the method of damage computations. We see no precedential value in this issue. We, therefore, conclude it would be inappropriate to burden this opinion with a lengthy discussion of this many-faceted issue. It is sufficient to say we have carefully examined the record, considered the contentions of the parties and conclude no reversible error has been shown in the trial court's allowance and computations of compensatory damages.

The third issue is whether the trial court erred in allowing prejudgment interest on the compensatory damage award. Prejudgment interest was allowed from the February 1978 shutdown of Ellis No. 1 (and another uncompleted well) to date of judgment.

A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation. *Where an amount is due upon contract, either expressed or implied, and there is no uncertainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date. Equity Investors, Inc. v.*

*Academy Ins. Group, Inc.*, 229 Kan. 456, 625 P.2d 466, *modified on other grounds* 229 Kan. 668 (1981); *First National Bank v. Bankers Dispatch Corporation*, 221 Kan. 528, 537, 562 P.2d 32 (1977).

The trial court made no finding the Plains claim became a liquidated claim as of that date and stated no other reason for such allowance. It is certainly true the parties were disenchanted with each other at the time of the shutdown of the rigs which had occurred after a history of acrimonious confrontations relative to how the work was being performed and, towards the end, over the failure of Plains to pay additional funds. However, ill will is not a basis for allowance of prejudgment interest. We do not believe under the totality of the circumstances herein plaintiff's claim can be considered to be a liquidated claim as of February 1978 so as to permit the allowance of prejudgment interest from that date. We conclude the trial court erred in allowing prejudgment interest on the contractual damage award.

The next three issues concern the punitive damage award which, by Empire's own admission, is its primary concern in this appeal. At this point it is appropriate to state in some detail the bizarre facts relative to the sabotage of the Ellis No. 1 hole.

The trial court, in its findings of fact, described defendant John Gable as follows:

"22. The first of these is John Gable, the President of Empire Drilling Co., Inc., and Empire Oil and Gas. Gable had been a contract driller since 1962 and had organized several contract drilling companies which were, more or less, predecessors to Empire Drilling and Empire Oil and Gas. At least one of these companies had gone bankrupt and another had been dissolved due to exorbitant insurance rates resulting from fatality accidents occurring during exploration operations. Gable had been convicted of a felony bankruptcy fraud as a result of his actions in one bankruptcy. At the time of trial Mr. Gable indicated that he had approximately $1,000,000.00 in judgments pending against him and was not a stockholder in either of the Defendant companies. However, his son and daughter each owned 90,000 shares in Empire Oil and Gas and a family trust owned 100% of Empire Drilling Company's stock."

The trial court described Dale Higgins, the Empire employee in charge of the drilling of Ellis No. 1 as follows:

"24. Next, to be introduced is the heavy, the villain, Dale Higgins, who was the tool pusher on Rig #6. He was variously described as being between 6'4" and 7'2" in height and 250 to 325 pounds, in weight. A man, who all agree, seldom shaved or seldom bathed. His covert nickname was 'The Ape', apparently in reference to his size, his lack of personal hygiene, his affinity for raw meat and

vegetables and, particularly, onions, and the fact that he slept on the floor of the dog house [drilling crew's on-site accommodation] with a railroad tie as a pillow. Higgins spoke with a loud voice used to oppress and threaten his subordinates. He presented himself as a bull-strong, violent, dangerous man who bragged of killing Arabs and disposing of their bodies after removing their jewelry. His actions in sabotaging the Ellis #1 Well raised one of Plaintiff's major claims in this case."

In February 1978 Plains became very concerned about the drilling conditions on its leases. The equipment utilized was in dangerous disrepair and caused delays in the operation. As found by the trial court:

"29. On the six wells which were drilled to total depth, Empire's average drilling time was 23-½ days per well. This drilling time exceeded the 14 days contemplated when the agreement was executed. It also exceeded the reasonable drilling time of 17 days established by the evidence."

Further:

"31. On February 8th Gilbert Kennedy [past-President of Plains] visited the Empire rig #6 supervised by Dale Higgins after being alerted about the conditions by Paisley, a mud logger. He gave Higgins oral and handwritten notice of the repairs needed and ordered a shutdown. While there he was drinking and was knocked senseless by either Paisley or Higgins.

"32. These conditions and the failure of the Defendant, Empire, to correct them led to a meeting among Gable and the Kennedy brothers [Gilbert Kennedy's brother, John Kennedy, was Vice-President of Plains] in Oklahoma City during early February of 1978. There [the] Kennedys enumerated their complaints about rig conditions and drilling progress, Gable advised them that the prepayment was consumed and more money was needed if drilling was to continue. Gable agreed to have the requested repairs done and Gilbert Kennedy said more money would be paid.

"33. The repairs were not made, nor was the money paid, and on February 16, 1978, the Plaintiffs sent formal notice to shut down drilling operations.

"34. Higgins habitually conferred with Gable whom he referred to as 'the Boss', since Empire had no drilling superintendent. These conferences occurred on almost a daily basis by telephone.

"35. After Gilbert Kennedy's shutdown of the rig for repairs, rumors circulated among the rig crew that 'Empire might be run off the hole'. A driller named Jack Porter asked the tool pusher, Higgins, if the rig was going to be permitted to finish drilling the Ellis #1. Higgins announced he would call 'the Boss' and in the overheard phone conversation stated, 'If they don't let us finish the well, they won't be able to move another rig in on the hole. We'll take care of it.'

"36. Higgins returned to well site of Ellis #1 and again stated in the rig doghouse: 'If they do run us off, we'll make sure they don't get back in the hole'. The next morning, during the tearing down of the rig, he ordered all the drill bits gathered and welded together with the cones up to be used to plug the hole. Higgins later dropped several pairs of the welded-together bits into the hole as

well as rope, pipe collars, cable and lumber. The actions resulted in total sabotage of the Ellis #1 well."

## Additionally:

"74. Higgins told at least two employees that since the Kennedys (Plains) were not going to pay for the well, 'we were going to plug the hole'. The information about the Plains nonpayment had to have been given to Higgins by someone in the Denver office of Empire. Higgins told Purcell he reported to Gable. Gable was the chief executive officer in Denver. He admitted he talked daily with Higgins. Higgins referred to him as 'Boss'. The overheard phone conversations between Higgins and the 'Boss' contained Higgins' proposal to 'take care of the well so that Plains could not get back on it.' Although Empire may not have known exactly what technique was to be used, those phone conversations gave adequate notice that some means was to be used to 'junk' or sabotage the well. Apparently after having been so notified Empire did nothing to prevent, and thus may have encouraged, the sabotage.

"75. The two phone conversations between Higgins and the Denver office of the Defendant, Empire, were established by testimony of coemployees and although the Defendant, Gable, could not recall the conversations, there was no evidence to indicate that the calls were not made by Higgins or that he did not inform his 'Boss' of his intended sabotage.

"76. Empire was aware that its employee, Higgins, was a big, wild, reckless, rough, unkempt man who carried weapons. Empire was informed that there had been objections by Plains to his continued employment since there had been discussions about replacing the rig supervised by him due to his failure to maintain the rig and his problems with the Kennedys and Plains' investors. Most all people who knew him were apprehensive of him due to his conduct, his threats and his self-reported escapades which depicted him as a violent, ruthless man. On occasion, Gable had revealed some apprehension when he made payroll deliveries. Higgins intimidated most all men he met including coemployees and Plains' agents and representatives. He bragged that he would not be fired by Gable and apparently he was not.

"77. Gable denies any recollection of the phone conversations with Higgins in which he was given any reason to believe that sabotage was planned, but he did give orders to lay down the pipe and move the rig after receiving the notice to shut down from Plains.

"78. Certainly Higgins was not pursuing any private objective of revenge against Plains when he 'junked' the hole. He was loyally avenging a wrong to his employer, Empire, in his own misguided manner.

"79. The acts of sabotage occurred during and incidental to tearing down the rig and preparing to leave the well site. This operation and its supervision are certainly within the scope of employment of a tool pusher who is, by practice, custom, and contract, the steward vested with responsibility for safeguarding the hole, the crew, and equipment.

"80. Higgins had been hired by Gable as a tool pusher for Empire after a personal interview and a recommendation of Frances Carper. Higgins supervised the drilling of six wells in Colorado before moving to Kansas. Gable acknowledged concern about Higgins when informed of problems with him by

the Kennedys. Orders were given by Gable to Higgins to make equipment repairs, but they were not followed. For example, after the rig was returned to Colorado substantial repairs were made and even the derrick was repaired or exchanged. Thus, Empire knew, or had reason to know, of its agent and employee's belligerent, reckless and imprudent character."

The fourth issue presented (the first relative to the punitive damage award) is alleged error in permitting testimony relative to what Mr. Higgins was overheard to say in a telephone conversation purportedly with the Empire home office. Mr. Higgins was not called as a witness at trial nor had his deposition been taken. Empire objected to the admission of testimony as to the overheard conversation on the ground such was inadmissible hearsay. The trial court permitted the testimony as an exception to the hearsay rule pursuant to K.S.A. 60-460(*i*)(1) which provides:

"(*i*) *Vicarious admissions.* As against a party, a statement which would be admissible if made by the declarant at the hearing if (1) *the statement concerned a matter within the scope of an agency or employment of the declarant for the party and was made before the termination of such relationship* . . . ." (Emphasis supplied.)

In *Schlatter v. Ibarra,* 218 Kan. 67, 542 P.2d 710 (1975), this court had an opportunity to consider K.S.A. 60-460(*i*)(1). In *Schlatter* defendant's son, Gus, had spoken with a Mr. Clyde Long about a matter concerning his mother's business. By the time of trial, Mr. Gus Ibarra was in Florida and unable to be present. At trial, with the son's agency to his mother established, Mr. Long was allowed to testify to what Mr. Ibarra had said. In *Schlatter* this court held:

"Under K.S.A. 60-460(*i*) an out-of-court declaration is admissible, as against a party, if the statement concerns a matter within the scope of an agency or employment of the declarant for that party, and was made before the termination of the relationship. *However, evidence extrinsic to the out-of-court declaration must be in the record to establish some substantial factual basis that an agency or employment existed before hearsay evidence may be admitted as an exception to the hearsay rule.*" Syl. ¶ 5. (Emphasis supplied.)

Specifically:

"The authorities are not agreed as to the question of the admissibility of a telephone conversation which has been conducted by some third person and repeated by him to another person. While some authorities have held such evidence to be competent, others have deemed the testimony to be objectionable as being hearsay. *However, a bystander who has heard another converse by means of a telephone may testify as to what the latter said, no violation of the*

*hearsay rule being involved where the purpose was to prove what the conversation was, not to prove the truth of the facts stated in the conversation.*" 2 Jones on Evidence § 7:33, pp. 155-56 (6th ed. 1972). (Emphasis supplied.)

See also:

"An agent is competent to testify to the declarations made by him, but it is not essential that he be called as a witness. *His statements may be proved by a third person.*" 29 Am. Jur. 2d, Evidence § 662, p. 714. (Emphasis supplied.)

In the instant action the bystander testimony was not admitted to prove Mr. Higgins sabotaged Ellis No. 1—indeed, defendant Empire has conceded as much; rather the testimony was admitted for the mere purpose to establish what the phone conversations were.

It is uncontroverted Mr. Higgins was an employee of Empire at the time of the telephone conversation. Further, he was the highest ranking on-site employee of Empire's in the drilling of Ellis No. 1. The statements made by Higgins directly concerned a matter within the scope of Higgins' employment—the operation of the Empire drilling rig and its possible shutdown. We conclude the Higgins statements are directly within the exception to the hearsay rule set forth in K.S.A. 60-460(*i*)(1) and the trial court did not err in admitting testimony relative thereto.

The fifth issue is whether the trial court erred in determining Empire was liable in tort for the sabotage of Ellis No. 1.

In holding Empire liable in tort for the sabotage of Ellis No. 1, the trial court stated:

"F. Plaintiffs have presented two tort alternative meritorious theories of recovery against Empire for the sabotage to the Ellis #1 Well. The first is that Empire Drilling is responsible under the theory of respondeat superior. The second is that Empire was negligent in the hiring or retention of Higgins, an incompetent or unfit employee.

"G. When the tool pusher, Dale Higgins, in the process of tearing down the rig after shutdown, directed that the drill bits be welded together and then dropped them down the open hole of the Ellis #1 rig well, he was acting in the scope of his authority and performing services for which he had been employed since this was reasonably incidental and directly involved in his employment. As stated in *Hollinger [v. Stormont Hosp. & Training School for Nurses,* 2 Kan. App. 2d 302, 311, 578 P.2d 1121, *rev. denied* 225 Kan. 844 (1978)]:

" 'The test is not necessarily whether the conduct was expressly authorized or forbidden by the employer, but whether such conduct should have been fairly foreseen from the nature of the employment and the duties relating to it. The liability of an employer for the acts of his employee depends not upon [whether the injurious act of the employee was willful and intentional or was unintentional, but upon] whether the employee, when he did the wrong, was acting in

the prosecution of the employer's business and within the scope of his authority, or had stepped aside from that business and had done an individual wrong. The now generally recognized rule is that the employer is liable for the reckless, willful, intentional, wanton or malicious acts of his employee as well as for his heedless and careless acts if they are committed while the employee is acting in the execution of his authority and within the course of his employment, or with a view to the furtherance of his employer's business and not for a purpose personal to the employee.'

"In view of the phone conversations in which he alerted the Denver office of his intentions to destroy the well and his own character, reputation and conduct, this action could have reasonably been foreseen by Empire. His actions were motivated by his desire to avenge what he considered to be a wrong to Empire to prevent Plains from gaining the benefit of a hole drilled by Empire which he thought had not been paid for at the time of the shutdown.

"H. Since the actions of Dale Higgins were intentional, criminal acts as opposed to negligent commissions or omissions, the case decisions arising around assaults and batteries by employees in the course of their employment bear close analogy. These cases and particularly *Williams v. Community Drive-in Theater, Inc.*, 214 Kan. 359 [, 366, 520 P.2d 1296 (1974)], as stated:
" 'If the assault is committed by the employee while furthering the employer's interest in some way the employer is liable under the doctrine of *respondeat superior*—Let the master answer.'
"Part of the tool pusher's duties included supervising the tear down of the rig and preparing it for the move. This, in turn, involves cleaning up the well site location and making disposition of trash items. The evidence indicates that he enlisted the aid of several of the other employees, over which he had supervision, in preparing the bits to be dropped down the hole. Thus, Empire Drilling should answer for all damages directly caused by the tortious acts and in this case intentional acts of its tool pusher who was assisted by other employees of the Defendant.

"I. The Plaintiff contends that, alternatively, Empire should be held liable for the damage resulting from Higgins' intentional sabotage on the common law theory that Empire was negligent in retaining an incompetent, or unfit, employee under the theory stated in *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360 [, 388 P.2d 824 (1964)]. Empire, through Gable, had been informed of the problems that Higgins had presented by his failure to maintain the equipment, his attitude and conduct toward the Plains personnel, his general character bolstered by his own statements of past criminal escapades. In addition, either Gable or someone in the Denver office, whoever informed Higgins that Plains was not paying for the drilling and was going to shut down the rig, had been placed on notice of his intended sabotage in the telephone conversations. Thus Empire knew, or had reason to know, of Higgins' propensities and his intended conduct, but took no measure to protect the Plaintiff's interests. No argument can be advanced that the sabotage of the well was not a direct result of this reckless and wanton propensity on the part of Higgins. Therefore, Plains is entitled to judgment under this theory also."

The findings of fact upon which the trial court based its conclusions are supported by substantial competent evidence

and will not be disturbed on appeal. We have no quarrel with the rationale of the trial court in holding Empire liable for its employee's acts under the theories of respondeat superior and negligent retention of an unfit employee.

In distinguishing between employer liability under respondeat superior and negligent hiring and/or retention of an unfit or incompetent employee, it has been said:

"Under the theory of respondeat superior the employer is vicariously liable for the employee's negligence, whereas under the theory of negligent hiring the employer is liable for his primary negligence in hiring or retaining the employee. In a respondeat superior action, it must be proved that the employee was acting within the course and scope of his employment and that he was negligent, which negligence was the proximate cause of the plaintiff's injuries. In a negligent hiring action, there is no need to prove that the employee's act was committed within the course and scope of employment. Furthermore, recovery may be had in circumstances where the employee himself was not negligent, such as where he suffered a blackout due to a physical condition which was unknown to him but should have been known to the employer." 2 Am. Jur. Proof of Facts 2d, Negligent Hiring § 3, p. 616.

As succinctly noted by one authority: "The application of the theory of independent negligence in hiring or retaining an employee becomes important in cases where the act of the employee either was not, or may not have been, within the scope of his employment." 53 Am. Jur. 2d, Master & Servant § 422, p. 437. In other words, "[A] master may be liable for injury caused by the wilful wrong of his servant on the basis of his negligence in hiring or retaining such servant, entirely aside from the doctrine of respondeat superior." 53 Am. Jur. 2d, Master & Servant § 438, p. 457.

The negligent hiring and/or retention doctrine recognizes that an employer has a duty to use reasonable care in the selection and retention of employees. This duty requires that an employer hire and retain only safe and competent employees. An employer breaches this duty when it hires or retains employees that it knows or should know are incompetent. 29 Am. Jur. Trials, Negligent Hiring of Employee § 2, p. 276. Liability exists under either of these doctrines relating to negligent hiring or retention despite the fact the direct cause of injury to the injured person is the negligent or intentional acts of an employee acting outside the scope of his employment. 29 Am. Jur. Trials, Negligent Hiring of Employee § 2, p. 276.

Kansas has long been associated with the majority of states

recognizing an action for negligent hiring and/or retention of an unfit or incompetent employee. In *Balin v. Lysle Rishel Post No. 68*, 177 Kan. 520, 280 P.2d 623 (1955), this court declared:

"A master may be liable for injuries to a third person which are the direct result of the incompetence or unfitness of his servant where the master was negligent in employing the servant or in retaining him in employment when the master knew or should have known 'of such incompetence or unfitness of the servant." Syl. ¶ 4.

See *Murray v. Modoc State Bank*, 181 Kan. 642, Syl. ¶ 1, 313 P.2d 304 (1957).

In *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 388 P.2d 824 (1964), plaintiff brought an action against defendants for injuries inflicted by an employee who was prone to horseplay and who committed an assault and battery upon plaintiff. In *Stricklin* this court said:

"The doctrine of *respondeat superior* is not here involved. This is a common-law action charging the master with actionable negligence in retaining an incompetent and unfit employee, and it is unnecessary to determine whether Burt was acting within the scope of his employment. In *Murray v. Modoc State Bank*, [181 Kan. 642,] it was held:

" 'A master may be liable for injuries to a third person which are the direct result of the incompetence or unfitness of his servant where the master was negligent in employing the servant or in retaining him in employment when the master knew or should have known of such incompetence or unfitness of the servant.' (Syl. ¶ 1.)" 192 Kan. at 367.

Corpus Juris Secundum has well summarized this area of law as follows:

"A master may be liable for injuries inflicted on a third person by his servant where he was guilty of negligence in selecting a servant incompetent or otherwise unfit to perform the services for which he was employed, and this is especially true where skill and capacity are required for the performance of the services or where the services require the use of instrumentalities which are very dangerous if not skillfully handled. The servant's incapacity must relate to the duties required of him, but it is not essential that the precise injury or accident which did occur could have been anticipated or foreseen, and it will be sufficient that the injury resulting therefrom is such as is usual and therefore might have been expected.

"The master, in selecting an employee, must exercise a degree of care commensurate with the nature and danger of the business in which he is engaged and the nature and grade of service for which the servant is intended, but is required to hire employees possessing only such skill as is ordinarily and reasonably commensurate with the work to be performed by them.

"*Retaining in employment a servant who is, or should be, known to be incompetent, habitually negligent, or otherwise unfit, is such negligence on the part of the master as will render him liable for injuries to third persons result-*

*ing from the acts of the incompetent servant, whether the master's knowledge of the servant's incompetency was actual, or direct, or constructive; the master is chargeable with knowledge of the incompetency of the servant if by the exercise of due or reasonable care or diligence he could have ascertained such incompetence."* 57 C.J.S., Master & Servant § 559. (Emphasis supplied.)

See also Annot., Employment of Incompetent, Inexperienced, or Negligent Employee as Independent Ground of Negligence Toward One Other Than an Employee, 8 A.L.R. 574; Note, *Torts—Recognition of Negligent Hiring Expands Employer Liability—Ponticas v. K.M.S. Investments, 331 N.W.2d 907 (Minn. 1983),* 10 Wm. Mitchell L. Rev. 361 (1984); Note, *Torts—Master and Servant—Negligent Hiring—Employer Owes a Duty to the General Public to Use Reasonable Care in Hiring and Retaining Employees. Evans v. Morsell, 284 Md. 160, 395 A.2d 480 (1978),* 9 U. Balt. L. Rev. 435 (1980); Note, *The Responsibility of Employers for the Actions of Their Employees: The Negligent Hiring Theory of Liability,* 53 Chi. - Kent L. Rev. 717 (1977); Brill, *The Liability of an Employer for the Wilful Torts of His Servants,* 45 Chi. - Kent L. Rev. 1 (1968); Loftus, *Employer's Duty to Know Deficiencies of Employees,* 16 Clev.-Mar. L. Rev. 143 (1967).

We have no hesitancy in concluding the factual findings made by the trial court amply supported its conclusion that Empire was liable in tort for the intentional sabotage of Ellis No. 1 on both theories—respondeat superior and retention of an unfit employee.

The sixth issue is whether the trial court erred in awarding plaintiff $1,000,000 in punitive damages. In this issue Empire launches a hydra-headed attack on the punitive damage award. First, Empire contends it had no tort liability arising from the sabotage of Ellis No. 1. This contention has been disposed of in the preceding issue.

Next Empire contends the tortious conduct of Higgins did not constitute an independent tort causing additional injury. Rather, Empire asserts the sabotage of the Ellis No. 1 well was a breach of its contractual obligation to protect and safeguard the hole. In support of this contention Empire calls our attention to the fact the trial court classified all compensatory damages as "contractual" damages, including the damage directly arising from the well sabotage. The trial court, after finding Empire liable in tort, stated:

"However, only one recovery can be awarded and the award of compensatory damages on the contractual claims of Plaintiff have made allowances for these damages with the exception of punitive damages."

Empire had a contractual obligation to safeguard the hole and failure to do so constituted a breach of the contract. Here, however, Empire's man in charge (there was no superintendent assigned to the rig) intentionally destroyed the hole, the drilling of which was the subject of the contract. This argument is somewhat akin to a security guard company contracting to provide a bodyguard to protect a client, then contending the premeditated murder of the client by the bodyguard constituted merely a breach of contract to protect the client even though the bodyguard was known to be vicious and had previously threatened to kill the client.

The trial court had a difficult task in computing previously paid overcharges and improper charges and determining how much of the unpaid invoices presented by Empire should be offset against amounts due Plains for the excessive charges. The compensatory damages occasioned by the sabotage are specifically designated in the computation of the aggregate compensatory damage award. It should be remembered also that a substantial portion of the unpaid invoices were for work done on Ellis No. 1, the subsequently sabotaged hole. The hole was drilled to approximately three-fifths of the contracted-for drilling depth when the sabotage occurred. It is not surprising the trial court, under the circumstances herein, elected to compute compensatory damages at one time and arrive at a total figure rather than piecemeal it into a contractual compensatory damage award and a tort compensatory damage award. Although the trial court referred to the compensatory damage award as being on "contractual claims" it is clear that compensatory damages were allowed specifically for the well sabotage as a part of the total compensatory damage award. Clearly the well sabotage constituted an independent tort causing additional injury.

In *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 652 P.2d 665 (1982), this court, in a combined contract and tort action, summarized Kansas law on punitive damages as follows:

"Damages for breach of contract are limited to pecuniary losses sustained and exemplary or punitive damages are not recoverable in the absence of an inde-

pendent tort. *Temmen v. Kent-Brown Chev. Co.*, 227 Kan. 45, 605 P.2d 95 (1980). This exception to the rule of unavailability of punitive damages in breach of contract actions is recognized when some independent tort or wrong results in additional injury which justifies the assessment of punitive damages by way of punishment of the wrongdoer. In such a case the proof of the independent tort must indicate the presence of malice, fraud or wanton disregard for the rights of others. The difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising under or imposed by agreement; whereas, a tort is a violation of a duty imposed by law. *Atkinson v. Orkin Exterminating Co.*, 230 Kan. 277, 634 P.2d 1071, *adopting* 5 Kan. App. 2d 739, 625 P.2d 505 (1981)." 232 Kan. at 78-79.

The requirements set forth in *Guarantee Abstract* are satisfied in this case.

Next Empire argues in Kansas a corporation cannot be liable in punitive damages for the tort of an employee unless the employer corporation had complicity in the tortious conduct. On November 10, 1982, the trial court filed its judgment in this action. Eight months later, on July 15, 1983, this court announced its decision in *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 666 P.2d 711 (1983). In *Kline* the question before the court was whether, under Kansas law, a corporation could be held liable for punitive damages arising from an act of an agent or employee, within the scope of the agent's or employee's employment, when the corporation, through its board of directors or an officer, neither directed, authorized nor ratified the act. 233 Kan. at 989. In *Kline* this court noted there were two views on this question. The first held a corporation could be liable upon the standard rules of vicarious liability for the torts of an agent or employee. The second held a corporation could not be made to answer unless it had been "complicit" in the tortious conduct. The court noted the vicarious liability rule was followed by a majority of American states while the complicity rule was adhered to by a considerable minority of American jurisdictions. 233 Kan. 990-91. In *Kline* this court adopted the complicity rule as enunciated in Restatement (Second) of Torts § 909 (1977), which provides:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

"(a) the principal or a managerial agent authorized the doing and the manner of the act, or

"(b) *the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him,* or

"(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

"(d) the principal or a managerial agent of the principal ratified or approved the act." (Emphasis supplied.)

In the instant action the trial court concluded both of plaintiff's alternative tort theories, vicarious liability and negligent hiring and/or retention of Mr. Higgins, were meritorious. It should be noted in making its ruling the lower court made reference to Restatement (Second) of Torts § 909. The ensuing comments to section 909 reveal the Restatement provision is meant to be applicable in a situation such as here.

"It is . . . within the general spirit of the rule to make liable an employer who has recklessly employed or retained a servant or employee who was known to be *vicious*, if the harm resulted from that characteristic." Restatement (Second) of Torts § 909, Comment *b*, p. 468 (1977). (Emphasis supplied.)

Additionally, in *Kline* this court, in following Restatement (Second) of Torts § 909, held a corporation might be liable for punitive damages resulting from acts of its employees when it directed or ratified those acts. 233 Kan. at 994. In the instant action there was evidence in the record Empire management knew of Mr. Higgins' intended course of conduct a week before the sabotage of Ellis No. 1 occurred and did nothing to dissuade or forestall Mr. Higgins from his intentional and criminal acts. Silence under these circumstances could certainly be held to constitute ratification, especially when Mr. Higgins remained in the employment of Empire until the filing of this action. Further, it could be argued Higgins, as the top company man on the drilling site with no supervision in the State of Kansas, was in a managerial position. It is unnecessary to go as far as these latter grounds, however, as inherent in the trial court's findings is that the negligent retention of Higgins was reckless and, therefore, a proper basis for allowance of punitive damages under *Kline* and Restatement (Second) of Torts § 909 (1977).

This brings us to the final point in this issue. Does the award of $1,000,000 in punitive damages shock the conscience of this court so as to require the award be set aside? According to Empire:

"A punitive damage award of $1,000,000, an amount more than eleven times the compensatory damages for the loss of the Ellis hole, is more than merely a deterrent. It amounts to a shocking confiscation of the assets of a struggling

corporation. The award of punitive damages is excessive under the circumstances of this case and should be set aside."

The trial court found:

"13. Empire Drilling and its alter-ego, Empire Oil and Gas, are corporations of substantial income, means and net worth. The most current financial information available at time of trial indicated that 1981 revenues were approximately $17,000,000.00 and 1981 reserves were approximately $20,000,000.00, with total assets of $31,000,000.00 and an overall operating profit in 1981 of $4,000,000.00."

In its conclusions of law relative to the punitive damage award, the trial court stated:

"K. In determining the amount of punitive damages which can be assessed for this well sabotage, the Court has considered the elements set out in *U.S.D. No. 490 v. Celotex Corp.*, 6 Kan. App. 2d 346 [, 629 P.2d 196, *rev. denied* 230 Kan. 819 (1982),] and in *Binyon v. Nesseth*, 7 Kan. App. [2d 110, 638 P.2d 946 (1981), *aff'd* 231 Kan. 381, 646 P.2d 1043 (1982)], which included the nature, extent and enormity of the wrong, the intent of the party and the surrounding circumstances of the contractual arrangement and conduct between Plains and Empire.

"L. These factors in this case indicate that this was a felony act occasioned during a time when the perpetrators were in a position of trust with reference to Plaintiff's property. It violated not only the express contractual obligation of the Defendant to safeguard the hole, but also the implicit obligation and confidence that arises in the industry among drilling companies, oil producers, working interest owners, investors, mineral interest owners and land owners to work toward a common objective of exploring for, finding and producing petroleum products. This conduct has far reaching consequences. The acts were premeditated and deliberately planned so as to make retrieval of the [drilling] bits next to impossible. . . . [T]his perfidious ruination of the well exhibits the pinnacle of the contempt held by Empire for the good faith normally and traditionally inherent among contracting parties. Since Empire had been paid well in advance for most of its services and had very handsome revenues from other activities, the malice here displayed increased and as the adage goes, 'punishment ought to be increased as malice increases'. Punitive damages are assessed against Empire Drilling Co. in the amount of $1,000,000.00 in favor of the Plaintiff."

We take notice of the fact oil and gas drilling contractors frequently perform their services in remote areas far from the likelihood of supervision by those paying the high cost of such work. Wildcat oil exploration is a high-risk investment. Sabotage by one's own drilling contractor should not be an added risk of the operation. The outrageous conduct of intentionally sabotaging the well is abhorrent to all concepts of trust and fair dealing. Certainly the sabotage of the hole is an activity which should be

punished and others in like circumstances be deterred from committing.

Empire points out Gilbert Rockwell Kennedy, President of Plains, was not a candidate for a good citizenship award. In its findings of fact, the trial court described Mr. Kennedy as follows:

"His alcoholic binges, intemperate conduct and jet set appetite contributed substantially to the emerging problems between Plains Resources and Empire Drilling. These characteristics, combines with his lack of business ethics and self-dealing, resulted in his termination as President of the Plaintiff, Plains, and subsequent criminal charges being filed by Plains for alleged embezzlement and also litigation prompted by his successor in office against him to recover funds allegedly misappropriated and converted during his tenure as President. He appears to have been, during the time in question, a high rolling promoter of the Lear jet set, who was a bad tempered drunk, sophisticated, well educated and a suspected embezzler."

However, the character deficiencies of Plains' president are not matters of consideration in the area of punitive damages against Empire. As the Court of Appeals stated in *Sanders v. Park Towne, Ltd.*, 2 Kan. App. 2d 313, 578 P.2d 1131, *rev. denied* 225 Kan. 845 (1978):

"[P]unitive damages 'are permitted whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. (*Malone v. Murphy*, 2 Kan. 250; *Albert Wiley v. Keokuk*, 6 Kan. 94; and *Cady v. Case*, 45 Kan. 733, 26 Pac. 448.) Such damages are allowed not because of any special merit in the injured party's case, but are imposed by way of punishing the wrongdoer for malicious, vindictive or a willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs. (*Stalker v. Drake*, 91 Kan. 142, 136 Pac. 912; see, also, *Townsend v. Seefeld*, 102 Kan. 302, 169 Pac. 1157; and 15 Am. Jur., Damages, § 266, p. 700.)' *Watkins v. Layton*, 182 Kan. 702, 705, 324 P.2d 130 (1958)." 2 Kan. App. 2d at 318-19.

In *Henderson v. Hassur*, 225 Kan. 678, 594 P.2d 650 (1979), this court stated:

"The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Will v. Hughes*, 172 Kan. 45, 55, 238 P.2d 478 (1951). In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses. *Ayers v. Christiansen*, 222 Kan. 225, 229, 564 P.2d 458 (1977)." 225 Kan. at 694.

See *Cantrell v. R. D. Werner Co.*, 226 Kan. 681, 686, 602 P.2d 1326 (1979).

The conscience of this court is not shocked by the punitive damage award entered herein and, accordingly, the same will not be disturbed on appeal.

For its final issue Empire contends the cumulative effect of all the previously discussed alleged errors mandates reversal. Having found no error by the trial court, this issue is moot.

Before concluding this opinion we wish to commend the trial court on its handling of this complex and time-consuming litigation. The trial court's findings of fact and conclusions of law are skillfully drawn, thorough, and, obviously, the product of careful consideration of the evidence and the applicable law.

The judgment is affirmed as modified, the modification being the disallowance of the prejudgment interest awarded by the trial court.